**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Reginald Jerome SHYE et al., Defendants-Appellants.**

**Nos. 73–1968 to 73–1971.**

United States Court of Appeals, Sixth Circuit.

Jan. 29, 1974.

Decided March 7, 1974.

Robert S. Brandt (Court-appointed), Nashville, Tenn., on brief, for Reginald Jerome Shye.

Carlton H. Petway (Court-appointed), Nashville, Tenn., on brief, for James Clarence Floyd.

Clark H. Tidwell (Court-appointed), Nashville, Tenn., on brief, for James Alfred Stevenson.

William Buford Bates (Court-appointed), Nashville, Tenn., for James Edward Cox.

Charles H. Anderson, U. S. Atty., Joe B. Brown, Asst. U. S. Atty., Nashville, Tenn., on brief, for plaintiff-appellee.

Before PHILLIPS, Chief Judge, and EDWARDS and McCREE, Circuit Judges.

PER CURIAM.

These appeals, which were consolidated for hearing, were brought by four

co-defendants who were convicted of bankrobbery in violation of 18 U.S.C. § 2113(d). An interlocutory appeal pursuant to 18 U.S.C. § 3731 was brought by the government from the granting, in part, of defendants' pretrial motion to suppress certain evidence. On appeal, that order was vacated in part and affirmed in part. United States of America v. Shye et al., 473 F.2d 1061 (6 Cir. 1973).

The convictions from which these appeals are taken occurred in jury trials, following our remand. On appeal, appellants present two issues: (1) whether the arresting officers' warrantless entry and search of an apartment was valid, and (2) whether the district court should have suppressed evidence seized as the result of the arrest of appellants in the apartment and a search of that part of the apartment under their control.

We affirm the convictions for the reasons set forth in Chief United States District Judge Gray's order of July 9, 1973, attached hereto as an appendix.

## APPENDIX

In The
UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION
UNITED STATES OF AMERICA,
v.
REGINALD JEROME SHYE, JAMES EDWARD COX,
JAMES CLARENCE FLOYD, JR. and
JAMES ALFRED STEVENSON

Criminal No. 14,935

ORDER

(Filed July 9, 1973)

The defendants in this criminal action have been indicted for armed robbery in violation of 18 U.S.C. Section 2, 2113(a), and 2113(d). For the second time, the action is before the court on a motion to suppress evidence which the defendants contend was the product of an illegal arrest, search, and seizure. The facts surrounding the arrest, search, and seizure in question were adduced at three separate hearings, the Magistrate's hearing and the two suppression hearings held by this court, the transcripts of which are a part of the record herein. The pertinent facts are set forth below as a prelude to the recitation of the procedural history of the case and to the disposition of the issues now before the court.

The Nashville City Bank and Trust Company was robbed shortly before noon on January 18, 1972, by four Black males, described as follows: one was short and one was tall, the other two being about (fol. 2) six feet in height; the short robber wore a ski mask and the other three wore distinctive hats, one of which was fur and another of which had a wide brim; some of the robbers wore coats that appeared to be of leather, one of which was lavender in color; and the short man had a sawed-off shotgun, and two others had pistols. The robbers used a white sack to carry the money, and they were seen leaving the bank in a 1968 or 1969 two-toned "fastback" Ford Fairlane automobile. (This information was given the police officers and F.B.I. agents by witnesses shortly after the robbery.)

On the day before the robbery, January 17th, Detective Summers of the Nashville Metropolitan Police Department had gone to the apartment of defendant James Edward Cox, located at 1208 26th Avenue, North, Nashville, Tennessee, to question Cox about another bank robbery. When the detective arrived at the apartment, he observed Cox working on a 1969 "fastback" Ford Fairlane automobile and going back and forth between the car and his apartment, Apartment "A." Detective Summers did not question Cox, but merely observed him for a time; he wrote down the license number of the car and the address of the apartment.

The next day, when Summers arrived at the scene of the robbery, the description of the get-away car triggered his memory of the events of the day before and he immediately contacted other officers by radio so as to ascertain whether the car was at the same location where

he had seen it the previous day. He was told that the car was parked within forty or fifty yards of Cox's apartment, and so Summers, some F.B.I. agents and other Metropolitan Police officers went to Apartment "A," 1208 26th Avenue, North.

Agent Hamar of the F.B.I. immediately went to where the car was parked, got the license number and ordered a radio check thereof. (Fol. 3) While the check was being made, Hamar looked through the car window and observed a white sack and a hip-length wool coat on the car seat. He also felt the car radiator and noted that it was warm, indicating that it had recently been driven. Other agents arrived, bringing with them the man, Mr. Angel, who had described the get-away car. Mr. Angel identified the automobile in question as the get-away car. At about the same time, the radio license check came in, revealing that the plates on the Ford were registered to a Chevrolet. Based on all this information, Hamar ordered a search of the car. This search turned up a sawed-off shotgun, as well as the coat and sack mentioned *Supra*.

In the meantime, other officers and agents had proceeded to Apartment "A," which Detective Summers had indicated was the apartment into which Cox kept returning in the course of working on the car the day before. They identified themselves and began knocking on both the front and back doors to the apartment, but received no response and could hear no noises from inside the apartment. This identification and knocking procedure was repeated intermittently during the entire time the officers were outside the apartment.

Other officers began checking the other apartments to find out where they could get a key to the apartment in question and to confirm the fact that Cox lived there. They were successful on both counts, and F.B.I. Agent Thune was sent to a downtown realty company to obtain a key to the apartment. When Thune returned with a key, it was tried on both doors, but it would not open either.

During this period of time, the F.B.I. agents in charge, Agents (fol. 4) Rodgers and Hamar, held a discussion about whether they should attempt to get a search warrant for the apartment or whether they should await the arrival of Mrs. Cox (they having learned that she would be returning from work in approximately thirty minutes) and obtain her consent for a search of the apartment. They decided to pursue the consent route and to forego the warrant procedure.

Approximately an hour after the officers had first arrived on the scene but before Mrs. Cox's expected return, the situation changed drastically. Either five or six law enforcement officers were at the front door when it opened slightly and someone from inside said, "We're coming out." The officers could see several Black males inside at this point.

Four witnesses testified concerning the succeeding sequence of events: defendant Cox, Agent Harrigan of the F. B.I., and Officers Smith and Pollard of the Metropolitan Police. The agent and the officers were just outside the door and, of course, defendant Cox was inside. Agent Harrigan testified that one of the officers ordered the occupants to come outside. Officers Smith and Pollard testified that the door began to close slightly and slowly and that someone from inside said, "Come on in." (Agent Harrigan did not corroborate the officers' assertion that someone said, "Come on in"; neither did defendant Cox.)

In any event, when the door began to close slowly, the officers rushed in and promptly placed the defendants against a wall in the apartment. While some of the officers were taking care of the defendants, other officers began to fan out through the apartment, picking up items of evidence as they went. The items seized, thirteen in number, included articles of clothing resembling those de-

scribed as having been worn by the bank robbers, six .38 calibre bullets, two (fol. 5) pistols, four bags of money, some other money enclosed by rubber bands, and a gold card case containing identification papers and eleven $100.00 bills.

When the defendants were taken down to the station house, their statements were taken and defendant Shye surrendered a $10 bill that was on his person.

In advance of trial, the defendants moved to suppress the items of evidence taken from the car and from Cox's apartment. The initial suppression hearing was held on May 24, 1972. Following that hearing, this court ordered suppression of the evidence taken from the car and part of the evidence taken from the apartment.[1] Pursuant to 18 U.S.C. Section 3731, the Government appealed that part of the court's Order suppressing the evidence seized from the car and one bag of money found in the apartment.[2]

On January 23, 1973, the United States Court of Appeals for the Sixth Circuit filed an Opinion which reversed this court's suppression of the evidence seized from the car and affirmed this court's suppression of the bag of money found in the apartment. In remanding the case to this court, however, the Court of Appeals raised the question of whether the police officers were justified in making a warrantless entry into the apartment of defendant Cox, but declined to reach the issue thus raised. Though the Court did not reach (fol. 6) the issue of the warrantless entry, the footnote to the Opinion indicated that the Court had serious reservations about the legality of such an entry. United States v. Shye, 473 F.2d 1061 (6th Cir. 1973).

The remand spawned a second motion to suppress, grounded on the proposition that the warrantless entry of Cox's apartment and arrest were illegal and, therefore, that the admission of any evidence that could be deemed a fruit of that arrest would be in derogation of the defendants' Fourth Amendment rights.

On April 24, 1973, a second suppression hearing was held at which the following witnesses testified: Agent Rodgers of the F.B.I., who testified concerning the events leading up to the opening of the apartment door (he was not at the door when it was opened); Officer Luther Summers, who testified about another warrant for the arrest of defendant Shye that was outstanding at the time of the arrest in question;[3] F.B.I. Agent Thune, who testified about his trip from the apartment downtown to obtain a key to the apartment and to the fact that the key would not work; and other agents who testified concerning the taking of the defendants' statements after the arrest and about the circumstances surrounding the taking of the $10 bill from defendant Shye.

Having recited the pertinent facts and the procedural history of this case, it now remains to determine (fol. 7) whether, on these facts, the warrantless entry of the apartment and the arrest of its occupants were illegal as violative of the Fourth Amendment to the United States Constitution. This determination requires, initially, the drawing of certain factual conclusions from the evidence in this case. These findings are set forth below.

First, the court is of the opinion that it cannot be said that the law enforcement officers *knew* that there was anyone in

1. The inadmissibility of some of the items of evidence taken from the apartment was conceded by the U. S. Attorney; the rest were contested.

2. All other items seized in the apartment, whether suppressed or not, were not questioned by either side on appeal.

3. This testimony was introduced by the Government under an alternate theory seeking to uphold the arrest of defendant Shye, even if the arrest at the apartment was held invalid. The Government's proof failed on this theory.

the apartment in question until the door was opened. Although they knew that the automobile parked near the apartment had been identified as the getaway vehicle and that Cox had been working on that car from that apartment the day before, this would not elevate the officers' knowledge concerning whether the apartment was occupied beyond a mere suspicion. Moreover, this suspicion was rebutted to some extent by the fact that the officers had been unable to get a response to intermittent knocking and had heard no sound from inside at all. The fact that the agents were demonstrably thinking in terms of a *search* warrant and search, rather than an *arrest*, lends credibility to this conclusion.

Thus, it is reasonable to conclude that the primary concern of the officers was to get into the apartment to search. They tried various ways to accomplish this purpose, some of these methods assuming the presence of the occupants and some assuming their absence. They tried knocking on the door, tricking the defendants out of the apartment through loud talk about sending for a key, sending for and trying a key, and, finally, waiting for Mrs. Cox to return in order to obtain her "consent" to search the apartment.[4] (fol. 8) Second, it is obvious to the court that there was a material and drastic change in the entire situation when defendant Stevenson opened the door; for, when the door opened, the focus of the investigation changed from that of search to arrest, the uncertainty as to how to proceed ended, the grains of information previously known to the officers crystallized, and, when the door began to close, an emergency confronted them. In other words, the legal alternatives they had previously pondered (and were in the course of resolving erroneously; *see*: Note 4, *supra*) were no longer material,

having been superseded as a result of the turn of events.

Third, the changed situation must be characterized as an emergency situation by virtue of the information known to the officers before entry was gained. The officers knew that:

(1) the bank was robbed by four Black males who used a Ford Fairlane "fastback" to flee the bank;

(2) that same automobile was then parked only 40–50 yards away;

(3) the defendant Cox had been observed the day before working on that same car and going to and from the apartment in question;

(4) the defendant Cox leased and lived in that apartment;

(5) Cox was under investigation in connection with another bank robbery and was probably one of the men inside the apartment;

(6) more than one Black male could be seen inside the apartment when the door opened, and there had been no discernible activity from inside in spite of repeated efforts on the part of the officers to get a response;

(7) a white sack similar to the one used in the (fol. 9) robbery was found in the car identified as the get-away car, as well as a sawed-off shotgun (one of the robbers had carried a sawed-off shotgun); and

(8) at least two of the robbers had brandished pistols during the robbery and, presumably, still had the pistols.

The court is of the opinion, therefore, that in order to determine whether the warrantless entry was justified, the inquiry must focus on the moment the door was opened by defendant Stevenson. The court is further of the opinion that, at that juncture, the officers had probable cause to believe (amounting almost to a certainty) that the occupants

---

4. The court feels compelled to note here its grave concern regarding the officers' obvious attempts to circumvent the warrant requirement. Indeed, if the arrest and search herein had been made in accordance with these plans, the constitutionality thereof would be extremely doubtful. See Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L. Ed.2d 797 (1968).

of the apartment were the armed robbers for whom they were looking and that the situation required quick and decisive action to prevent possible bloodshed or a seige.

Thus, the precise issue before the court is whether the described "emergency" situation confronting the law enforcement officers, when the door to the apartment opened and then began to close, justified their warrantless entry into the apartment to arrest occupants.

As the court turns to this issue and the law pertaining to warrantless arrests, it is guided by the Sixth Circuit's footnote, *supra,* which *inter alia,* cites the decisions which were apparently deemed controlling and which this court will follow. These are the decisions in the cases of Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); Vance v. State of North Carolina, 432 F.2d 984 (4th Cir. 1970); Dorman v. United States, 140 U.S.App.D.C. 313, 435 F.2d 385 (1970) (en banc), and Wong Sun v. United States, 371 U.S. 471, 482–484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The starting point in discussing these cases is the decision in Warden v. Hayden, *Supra,* wherein the Supreme Court ruled that a warrantless entry of a dwelling would not run (fol. 10) afoul of the Fourth Amendment where the circumstances were such that "the exigencies of the situation made that course imperative," and where delay in the course of an investigation would endanger the officers' lives or the lives of others. *Id.,* 387 U.S. at pp. 298–299, 87 S. Ct. at p. 1645. This principle was elaborated on and extended in Dorman v. United States, *Supra,* and Vance v. North Carolina, *Supra.*

■ In United States v. Dorman, the United States Court of Appeals for the District of Columbia Circuit, sitting *en banc,* held that the entry of a dwelling for arrest purposes without a warrant is *per se* unreasonable unless certain "exigent circumstances" were present to justify the police in bypassing the magistrate. In other words, the warrantless entry of a dwelling to arrest was put on the same constitutional footing as warrantless entry of a dwelling for a search. *See:* Coolidge v. New Hampshire, 403 U.S. 443, at 454–455, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Entry in both instances is *per se* unreasonable unless "exigent circumstances" justify the failure to obtain a warrant. The circumstances justify a warrantless entry, *e. g.,* "exigent circumstances," however, necessarily differ somewhat from an arrest situation to a search situation. In this regard, the *Dorman* Court went on to list seven considerations that would be material in determining whether the warrantless entry was justified. They are:

(1) That a grave offense is involved, particularly a crime of violence;

(2) the suspect(s) is (are) reasonably believed to be armed;

(3) a clear showing of probable cause;

(4) a strong reason to believe that the suspect(s) is (are) in the dwelling;

(5) the likelihood of escape if not swiftly apprehended; (fol. 11)

(6) a peaceable entry, as opposed to a "breaking;" and

(7) the time of entry (day or night). Dorman v. United States, *Supra,* 435 F.2d at pp. 392–393.

The *Dorman* decision, then, is significant in that it placed search and arrest, following a warrantless entry of a dwelling, on the same constitutional footing and listed some of the important considerations relative to the absence or presence of "exigent circumstances." The significance of Vance v. State of North Carolina, lies in the fact that the United States Court of Appeals for the Fourth Circuit followed the decision in *Dorman* with request to both the *per se* unreasonableness of warrantless entries of dwellings and the principal factors to be considered in determining whether "exigent circumstances" justified the entry without a warrant.

In the case at bar, a comparison of the facts with the considerations just cited point convincingly toward a holding that the officers' entry of the apartment and arrest of the occupants therein without a warrant was reasonable in light of the exigent circumstances and, therefore, constitutional. A violent crime was involved and the suspects were believed to be (and were in fact) armed. The danger inherent in the situation when the door opened and began to close was further aggravated by virtue of the prolonged silence from within that had preceded the opening of the apartment door. There was a clear showing of probable cause to believe that the occupants of the apartment were guilty of the crime under investigation, and there was no doubt in the officers' minds, after the door opened, that at least some of the men they believed had committed the robbery were inside. Although there was little likelihood of escape, due to the presence (fol. 12) of so many officers, there was, nevertheless, a substantial likelihood of bloodshed or an impending siege if quick action were not taken. The entry was accomplished without a "breaking" and it was not a nighttime entry. With these seven considerations as a point of comparison, the facts here make a stronger case for upholding the legality of the entry than those upheld in either *Vance* or *Dorman.*

It is not enough, however, to apply these seven considerations, for there is one distinguishing factor that was present in both *Dorman* and *Vance* that was absent in the instant case. In both *Dorman* and *Vance,* the officers had at least attempted to comply with the warrant requirement (In the former, the magistrate could not be found; in the

latter, the warrant obtained was later held invalid because it was not issued by a detached magistrate.); whereas, in the case at bar, the officers consciously avoided any resort to the warrant procedure. The significance of the fact that the officers in the other two cases attempted to obtain a valid warrant is twofold: It reflects favorably on the conduct of the officers and pays homage to the judicial preference for warrants; but more importantly, it accounts for the time factor, which speaks to the holding in Warden v. Hayden that delay constituting danger to lives can make an otherwise unreasonable entry reasonable. Although it is unclear from the *Dorman* decision just how much importance is attached to the time or delay factor, a fair reading of that decision indicates that lack of *undue* delay incident to obtaining a warrant could vitiate the effect of the presence of the other seven considerations listed therein. Thus, the fact that the officers in the instant case did not even attempt to get a warrant could become a determinative factor.

On these facts, however, the court is of the opinion (fol. 13) that the distinguishing factor, alluded to above, does not compel a finding that the entry and arrest were illegal. This is because the event that led to entry here was an unexpected and intervening development, an event that, as previously noted, changed drastically the complexion of the entire situation and worsened the danger inherent therein. This intervening occurrence, the opening and subsequent closing of the apartment door on the heels of one hour of silence from within and in light of all the information at the officers' disposal, not only strengthened the officers' probable cause,[5] but negates the time factor satis-

5. It should be noted in this regard, especially in light of the previously cited footnote in the Court of Appeals' decision of this case, that the court finds a crucial distinction between the facts at bar and those present in Wong Sun v. United States, *Supra.* This distinction lies in the purpose behind an arrest following suspicious conduct and/or flight (the closing of a door). In *Wong*

*Sun,* the closing of the door meant avoidance of apprehension, whereas the closing of the door here meant danger to the officers' safety. See: Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Moreover, the closing of the door, of itself, in this case is not considered as establishing probable cause where none existed before.

fied in *Dorman* and *Vance* by unsuccessful resort to the warrant procedure. If the officers in the present case had merely arrived on the scene, checked the car, proceeded to the apartment and immediately entered (with or without force), with no waiting and no intervening cause, this case would be more analogous to *Vance* and *Dorman*, and the failure to attempt to obtain a warrant herein might require a condemnation of the entry and arrest under those cases; but the fact is that the choice of whether to obtain a warrant, for purposes of this inquiry, confronted the officers when, and only when, (fol. 14) the door opened and began to close, which, in light of the other circumstances, virtually disposed of the time problem. In essence, a fair interpretation of the facts at bar indicates that entry in this case was not an *action*, as in *Vance, Dorman* and *Hayden*, but was a *reaction* to the defendants' action. Thus, the factual distinction at issue does not compel a result different from that reached in *Vance* and *Dorman*.

Finally, the court feels that there is an additional factor in this case which relates to some of the factors previously discussed, the presence of more than one suspect, presumably armed, within the dwelling entered. This factor bears heavily on the reasonableness of the officers' conduct and lends further support to the court's view that *Hayden, Vance* and *Dorman* require that the legality of, and justification for, the entry here be sustained.

In summary, the court holds that, although the warrantless entry of a dwelling for the purpose of arrest is *per se* unreasonable absent "exigent circumstances," it finds that the circumstances present in the instant case constitute "exigent circumstances" and compel the conclusion that the officers acted reasonably.

Accordingly, it is ordered that the motion to suppress be, and the same hereby is, denied.

It is further ordered that the case be set for trial at 9:00 a. m. on the 30th day of July, 1973.

/s/ Frank Gray, Jr.
CHIEF JUDGE