**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Jacques BERENGUER, a/k/a Guy Sebbane, Defendant-Appellant.**

**No. 1467, Docket 77–1220.**

United States Court of Appeals, Second Circuit.

Argued Aug. 17, 1977.

Decided Sept. 22, 1977.

---

* Albert W. Coffrin, United States District Court for the District of Vermont, sitting by designation.

Jonathan J. Silbermann, New York City (William J. Gallagher, Federal Defender Services Unit, The Legal Aid Society, New York City), for defendant-appellant.

James P. Lavin, Asst. U. S. Atty., S. D. N. Y., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., Robert J. Jossen, Asst. U. S. Atty., on the brief), for plaintiff-appellee.

Before VAN GRAAFEILAND, WEBSTER,* Circuit Judges, and DOOLING,** District Judge.

---

* Of the U. S. Court of Appeals (8th Cir.), sitting by designation.

** Of the Eastern District of New York, sitting by designation.

WEBSTER, Circuit Judge:

Appellant Jacques Berenguer, also known as Guy Sebbane, was convicted in a jury trial of conspiring to possess Schedules I and II narcotic drug controlled substances with intent to distribute in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A) and 846, and of aiding and abetting the distribution of cocaine, in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(B). In this appeal he does not challenge the sufficiency of the evidence, but contends that he was prejudiced by (1) the admission of evidence of an independent conspiracy in which he was neither implicated nor charged and (2) the admission of testimony concerning currency which he contends was illegally seized following an illegal entry to effect his arrest. Upon a full review of the record, we affirm the judgment of conviction.

The evidence, viewed in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), established an on-going conspiracy between appellant, one Josalito Garcia and others to violate the narcotics laws. It also established that appellant aided and abetted the distribution of approximately one ounce of cocaine by Garcia to a government agent on May 20, 1976.

Briefly summarized, the government's evidence of conspiracy and distribution consisted of the testimony of government agents who participated in discussions with appellant and others, including Hugo Saito, a government informant who acted as interpreter [1] for appellant during these discussions and the corroborative testimony of other surveilling agents. The cocaine that was actually distributed to government Agent Schnakenberg by Garcia was introduced in evidence. Largely at appellant's instigation and on his repeated assurances, Agent Schnakenberg had no less than nine meetings with appellant leading up to the ultimate sale by Garcia to Schnakenberg. The evidence of appellant's participation both as conspirator and aider and abettor was very strong.[2]

Indeed, as previously noted, appellant makes no challenge to the sufficiency of the lawful evidence. Instead, he contends that he was prejudiced by the admission of irrelevant evidence of his association with one Carmello Sansone together with evidence of a sizable delivery by Sansone of ½ kilo of cocaine to Agent Schnakenberg on June 4, 1976. He also claims to have been prejudiced by testimony of a government agent about discovering some $3,200 in large denominations which appellant contends were illegally seized in his apartment at the time of his arrest.

I.

While the "sample" sold by Garcia to Agent Schnakenberg on May 20, 1976 was only about an ounce, it is clear from the evidence that appellant and other partici-

---

1. Appellant spoke only French at the meetings. Hugo did not testify· at the trial.

2. On May 14, 1976, Agent Schnakenberg first met with appellant and Hugo. Schnakenberg accepted appellant's price of $40,000 per kilogram for five kilograms. A second meeting later that night included Agent Finnerty, who spoke French. Appellant agreed to supply a sample on May 17, 1976. They met again on May 17; when appellant said he had been unable to obtain a sample, another meeting was held the same day. Appellant gave more assurances, but not a sample. Appellant met again with the agents the next evening, but appellant said he had been unable to locate Garcia, who would deliver the cocaine. Following an ultimatum by Schnakenberg, appellant met again two more times that night. Garcia finally arrived but was recalcitrant. Appel-

lant spoke to Garcia separately and then reassured the agents. Two more meetings on May 20 produced the sample. On the night of the sale, appellant and Agents Schnakenberg and Finnerty sat in a tavern waiting for Garcia's arrival. At about 8:00 p. m., appellant received a telephone call after which he informed the agents that the sale would occur a half hour later than had been expected. The agents agreed and at 8:30 p. m. Garcia arrived with the cocaine and the sale was consummated. Thus, it seems clear that appellant was an active participant in the transaction. Following the sale, Schnakenberg and Garcia rejoined appellant. They discussed delivery of the larger quantity but nothing happened until June 3, when Hugo introduced Schnakenberg to Carmello Sansone, who produced a ½ kilo through Hugo on June 4.

pants had under discussion plans to sell five full kilos to Agent Schnakenberg for $200,-000. Numerous meetings were set up and various modes of establishing mutual trust and a working relationship with Agent Schnakenberg (posing as a large narcotics buyer) were discussed and arranged; however, nothing materialized until the one ounce distribution on May 20, 1976. Thereafter, further efforts to acquire larger quantities were unproductive, although appellant directly or through Hugo sent messages of reassurance. Finally, on June 4, 1976, Agent Schnakenberg was able to acquire ½ kilo from Carmello Sansone, a man known to associate with appellant and who was in appellant's apartment on August 18, 1976 when appellant was arrested. The intermediary was the same government informant, Hugo Saito.

Evidence of the Sansone transaction was received over appellant's timely objection at trial. On appeal, appellant contends that the Sansone evidence was merely proof of a separate independent conspiracy in which no proof of appellant's involvement was established. He contends further that the size of the transaction, compared with the one charged in the indictment, made the evidence extremely prejudicial.

■ It is, of course, well established that guilt may not be inferred from mere association with a person whose guilt has been established. *United States v. Johnson*, 513 F.2d 819, 824 (2d Cir. 1975); *United States v. Garguilo*, 310 F.2d 249, 253 (2d Cir. 1962). If the government had proved only mere association with persons engaged in a separate conspiracy, appellant's argument would have some force, especially considering the relative size of the transactions. But the record reveals a different story.

The initial cautious behavior of appellant and Garcia did not cease after the May 20 sample delivery. Meetings were set up which failed to produce the larger shipment, and finally on May 25th Agent Schnakenberg, acting the role of an angry narcotics buyer, called off negotiations. On June 3, Hugo contacted Agent Schnakenberg and introduced him to Sansone.

Agent Schnakenberg had seen Sansone with appellant at the various places where they met to discuss the proposed large deliveries. Sansone offered to produce five kilograms for $40,000 per kilogram, the same terms that appellant had offered. When appellant was arrested in his apartment, Sansone was there.

■ We think these facts, including Sansone's knowledge of the terms of purchase and his continued association with appellant, were circumstantial evidence of appellant's involvement in an ongoing conspiracy to make the larger deliveries originally contemplated. *See United States v. Araujo*, 539 F.2d 287 (2d Cir. 1976). Because the defense might (and did) argue that the small amount distributed on May 20 was inconsistent with the conspiracy outlined in the indictment, we are satisfied that this evidence was not only relevant, but that its probative value was not substantially outweighed by the likelihood of prejudice. Fed.R.Evid. 403.

## II.

A more troublesome issue is presented by the admission of evidence seized following appellant's warrantless arrest in his apartment.

After obtaining advice from the United States Attorney's office on August 17, 1977 that probable cause existed to make an arrest, government agents proceeded to appellant's apartment on August 18. One agent knocked on the door and identified himself either as a mailman or superintendent. When appellant opened the door, he was placed under arrest. Appellant was taken into the apartment and placed on a bed with (and handcuffed to) Sansone, who was also arrested. The agents looked in all of the rooms. In the room where appellant was detained they observed and seized a wallet laying open upon a table alongside some small change and a billfold containing approximately $3,200 in $100 bills laying on a bureau. An agent was permitted to testify at trial concerning the discovery of the bills.

Appellant contends that the arrest was illegal because it was made by warrantless entry into appellant's apartment in the absence of exigent circumstances. Appellant further contends that in any event the seizure was illegal since it was neither in plain view nor properly incident to arrest.

(a) The arrest.

Probable cause to make the arrest was conceded at trial and is not challenged on appeal. The right to make a daytime warrantless entry into an apartment is vigorously disputed by appellant. The Supreme Court appears to have left this question open.[3] Appellant relies upon cases in other circuits holding that exigent circumstances must be present to justify such a warrantless search.[4] The government relies upon cases from this circuit in which daytime warrantless entries of apartments to effect an arrest were upheld.[5] It is, however, unnecessary to decide this question, since it is clear to us that the seizure of the billfold was in violation of the Fourth Amendment, even assuming a lawful arrest.

(b) The seizure.

■ First, the seizure cannot be sanctioned as a search incident to arrest. Appellant was shackled to Sansone on a bed and the billfold was clearly out of his reach

or immediate control. *See Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

At a suppression hearing held during trial, the District Court accepted the government's second argument, namely, that the cash was in plain view. We disagree. While some of the small change was visible, none of the larger currency referred to in testimony could be seen. These bills were found inside the billfold that was on the bureau.

■ The plain view doctrine for warrantless searches and seizures is subject to three express requirements: (1) the agents must be lawfully on the premises; (2) the discovery must be inadvertent, and (3) its incriminating nature must be immediately apparent. *Coolidge v. New Hampshire*, 403 U.S. 443, 464–69, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). It is the third requirement that is clearly missing in this case. The billfold offered no immediately apparent evidence of an inculpatory nature. It was only after the billfold itself had been searched that the large denomination currency was revealed. In addition, the government agent testified that he was looking for a passport because he had information that appellant might try to leave the country. Discovery of a passport under these circumstances would hardly have been "inadvertent".[6]

---

**3.** *United States v. Watson*, 423 U.S. 411, 418 n.6, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Gerstein v. Pugh*, 420 U.S. 103, 113 n.13, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Coolidge v. New Hampshire*, 403 U.S. 443, 480, 91 S.Ct. 20, 22, 29 L.Ed.2d 564 (1971). *See Jones v. United States*, 357 U.S. 493, 499–500, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958); Note, The Neglected Fourth Amendment Problem in Arrest Entries, 23 Stan.L.Rev. 995 (1971). Compare *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976).

**4.** *United States v. Phillips*, 497 F.2d 1131 (9th Cir. 1974); *United States v. Shye*, 492 F.2d 886 (6th Cir. 1974); *Vance v. State of North Carolina*, 432 F.2d 984 (4th Cir. 1970). *See Dorman v. United States*, 435 F.2d 385 (D.C.Cir.1970).

**5.** *United States v. Mejias*, 552 F.2d 435, 444–45 (2d Cir. 1977); *United States v. Fernandez*, 480 F.2d 726, 740 n.20 (2d Cir. 1973); *United States v. Hall*, 348 F.2d 837, 841 (2d Cir.), *cert. denied*, 382 U.S. 947, 86 S.Ct. 408, 15 L.Ed.2d 355

(1965). In all of the government's cases, exigent circumstances were present or consent to entry was given. The issue when exigent circumstances are clearly *not* present has apparently not been faced directly in this circuit. The government argues that fear that appellant might flee the country supplied the exigent circumstances here. Since the agents had cleared the probable cause question with the prosecutor one day before and made no showing that a warrant could not be obtained without causing delay, we doubt that the reason advanced could alone validate a warrantless arrest.

**6.** The government's other cases are readily distinguishable. They involve a bank money bag (*United States v. Di Stefano*, 555 F.2d 1094 (2d Cir. 1977)); drugs in view (*United States v. Monteill*, 526 F.2d 1008 (2d Cir. 1975)); and a hand gun whose location inside a container was pointed out by the defendant and hence was not "concealed" (*United States v. Candella*, 469 F.2d 173, 175 (2d Cir. 1972)).

See *United States v. Mapp*, 476 F.2d 67, 81 n.15 (2d Cir. 1973); *United States v. Bradshaw*, 490 F.2d 1097 (4th Cir.), *cert. denied*, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 193 (1974); *United States v. Griffith*, 537 F.2d 900, 903 (7th Cir. 1976); *United States v. Pond*, 382 F.Supp. 556, 562 (S.D.N.Y.1974), *aff'd* 523 F.2d 210 (2d Cir. 1975), *cert. denied*, 423 U.S. 1058, 96 S.Ct. 794, 46 L.Ed.2d 649 (1976). Compare *United States v. Rollins*, 522 F.2d 160, 166 (2d Cir. 1975), *cert. denied*, 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1976), in which passports in plain view were discovered in the course of a search for a weapon pursuant to a search warrant.

■ Having determined that the money was illegally seized,[7] it follows that it was error to permit the government agent to testify about finding it. We must therefore determine whether the error was prejudicial or harmless beyond reasonable doubt. See *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

First, the District Court entertained doubt about the relevancy of the evidence and allowed testimony only to show that appellant was in possession of bills in the denomination ($100) used by Agent Schnakenberg in purchasing narcotics from the conspirators. The bills were not traced to either of Agent Schnakenberg's transactions and the government made no claim in final argument that these were the same bills.[8] Moreover, appellant's possession of large bills was established independently by a car rental clerk who testified that appellant frequently rented automobiles and paid for them with $100 bills.

■ The evidence of appellant's guilt in this case was overwhelming. Two government agents heard and testified concerning appellant's inculpatory statements and activities.[9] This was corroborated by other agents surveilling from a distance. There can be no reasonable doubt that appellant masterminded the conspiracy and arranged for the distribution of cocaine to Agent Schnakenberg. The evidence of possession of $3,200 in untraced currency was circumstantial evidence of a purely cumulative nature, and we are satisfied that its admission, though error, did not affect the jury's verdict and was harmless beyond reasonable doubt.

Affirmed.

---

**7.** No claim is made here that the money was taken to the station house and inventoried for appellant's protection as in *United States v. Lacey*, 530 F.2d 821 (8th Cir. 1976). Such a claim would be inconsistent with the government's contention that it seized evidence whose incriminating nature was readily apparent.

**8.** The government attorney said:

I guess in the middle of August 1976, Special Agent Pavlick goes to Mr. Sebbane's apartment. In his apartment he arrests, as I said, Mr. Sansone, Mr. Sebbane, and Josalito Garcia's sister. He also finds on the bureau $3,200 in hundred dollar bills, and he also finds another, I think $250 in bills of Mr. Sebbane's on a table.

**9.** *See* note 2 and accompanying text *supra*.