UNITED STATES of America,
Plaintiff-Appellee,

v.

Amos Annice SCOTT,
Defendant-Appellant.

No. 77–5327.

United States Court of Appeals,
Sixth Circuit.

Argued April 12, 1978.

Decided June 16, 1978.

Walter C. Kurtz, Legal Services of Nashville, Nashville, Tenn., for defendant-appellant.

John H. Cary, U. S. Atty., Edward E. Wilson, Jimmie Baxter, Knoxville, Tenn., for plaintiff-appellee.

Before WEICK, EDWARDS and LIVELY, Circuit Judges.

WEICK, Circuit Judge.

Amos Annice Scott was charged in Count I of a two-count indictment with armed bank robbery and assault with a dangerous weapon, in violation of 18 U.S.C. §§ 2113(a) and 2113(d). Count II of the indictment charged his co-defendants, Vickie Nance and Elaine Katrina Smith, with having been accomplices after the fact by knowingly harboring Scott in order to prevent his apprehension, each aiding and abetting the other, in violation of 18 U.S.C. §§ 2 and 3. The defendants were tried by a jury which returned a verdict of guilty against Scott, and acquittal for both Nance and Smith. Scott was sentenced to twenty-five years' imprisonment, from which judgment of conviction he now appeals.

## I

Scott contends that both his arrest and certain evidence introduced against him were the fruit of illegal entries of the apartment of co-defendant Nance; that such evidence should have been suppressed; that the District Court erred in its instructions to the jury; and that the District Court should have directed a verdict of acquittal in his favor.

We disagree, and we affirm the judgment of conviction.

At 6:15 p. m. on March 4, 1977, an armed robbery took place at a federally insured savings and loan association in Knoxville, Tennessee, in which more than fourteen thousand dollars were taken. The robber was described by witnesses as a black male, six feet tall, of medium build, and wearing a ski mask. By 6:20 p. m. Knoxville police officers, who had been alerted by radio dispatch as to the bank robbery, were at the scene, and a ski mask was found, immediately, in the alley behind the bank.

About an hour later a black male, who met the general description of the robber, was seen running between two houses on Milligan Street, about a block from the scene of the robbery. He was pursued by Sheriff Wilson and Officers McGoldrick and Dexter, among others. Shots were exchanged and Officer McGoldrick was shot in the face by the suspect, who was later identified as Scott. Officer Dexter returned the fire and from a distance of between 40 and 50 feet he shot the fleeing suspect in the left foot. The suspect fell toward his right side, but recovered and continued running.

After the shooting incident the suspect could not be located, and the search of the neighborhood continued. A local resident, Karen Miller, in whose apartment the robber was reported to have been observed, mentioned Scott's name as a person who frequented the area. FBI Special Agent O'Rear recalled that he had had occasion to arrest Scott previously, in December, 1975, on a charge of unlawful flight to avoid prosecution for armed bank robbery. Special Agent O'Rear took Officer Dexter to the local FBI office to view a photo spread, at about 4:00 a. m., at which time Officer Dexter positively identified Scott as the man who had shot Officer McGoldrick.

At the time of his 1975 arrest by the FBI Scott had been in the company of defendant, Elaine Smith, and it was known that Scott often used her car, the description of

which was known to the FBI. Some time after midnight, i. e., on March 5, 1977, FBI Special Agent Risner was told by Smith's sister that Scott had picked up Smith at about noon on the day of the robbery, and also that Scott and Smith had friends on Graves Street, although no names or house numbers were known. Between 5:30 and 5:45 a. m. the defendant Smith's car was located by the FBI in front of a duplex at 915–917 Graves Street, about a block from Karen Miller's apartment and about a quarter-mile from the scene of the robbery.

At approximately 6:20 a. m. Knoxville Police Officer Pressley, Detective Wilson of the Knox County Sheriff's Department, and Special Agent Risner approached the apartment at 917 Graves Street. They had no warrant. Pressley and Wilson knocked on the front door for three or four minutes. During this time Agent Risner, listening at the back door, heard people walking around; he testified that he heard "too much commotion going on in that house to believe it was just one person getting out of bed." Agent Risner then walked around to the front door.

The knocks at the front door were answered by the defendant, Vickie Nance, who was the lessee of the apartment. According to the evidence as found by the District Court, at most one officer had a pistol drawn. Officer Pressley asked Nance if Amos Scott was there. Her response, according to her own testimony, was: "If there's going to be any shooting in here I'm getting out." She then grabbed her little girl and ran next door. Nance testified that she had no recollection of the officers' stating the reason for their presence at her door, and denied having given them permission to enter. All three officers, however, testified that before Nance ran out of the house Officer Pressley asked her if they could look around. Sheriff Wilson, whose testimony was credited by the District Court recalled specifically that she responded, "Yes, you can look."

The officers searched the apartment and found Scott in a bedroom, hiding under the bed. His left foot was wrapped in a bloody bandage. In plain view next to Scott under the bed was a paper bag filled with the bank's money. This bag was marked and left in place, and the room was then sealed off. Scott was arrested and was taken to a hospital where an examination revealed a bullet wound in the left foot.

While the initial entry and arrest were taking place another FBI agent obtained from Nance express oral and written consent to search her apartment. She was informed that she had the right to refuse, but she stated at the time of giving her consent that she had nothing to hide and therefore had no reason for objecting to a search of her apartment. Nance repeated these identical statements in her testimony at the trial. After Nance gave consent, the FBI agents contacted a United States Attorney, who advised them that a consent search could be made.

The second entry and search ultimately disclosed a .38 caliber pistol hidden between the mattress and springs of the bed under which Scott had been found. This pistol was later determined to be the gun used to shoot Officer McGoldrick in the face. The paper bag was found to contain $7,080, of which $500 was marked "bait" money. Two ski masks were also found. All of this evidence was introduced against Scott at the trial.

Scott contends that the two searches of Nance's apartment violated his rights under the Fourth Amendment. It is our opinion, however, that Nance's consents to both searches were freely and voluntarily given.

The burden was on the Government to prove that consent, justifying a warrantless entry, was freely and voluntarily given. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *United States v. Killebrew*, 560 F.2d 729, 733 (6th Cir. 1977).

As this Court has continually held, consent must be proved by clear and positive testimony, and, to be voluntary it must be unequivocal, specific, and intelligently giv-

en, uncontaminated by any duress or coercion. *United States v. McCaleb*, 552 F.2d 717, 721 (6th Cir. 1977); *Simmons v. Bomar*, 349 F.2d 365, 366 (6th Cir. 1965).

■ Voluntariness of consent to search is an issue of fact to be found by the trial court, *Rosenthall v. Henderson*, 389 F.2d 514, 516 (6th Cir. 1968), and such findings are subject to the "clearly erroneous" rule, *United States v. Canales*, 572 F.2d 1182 at 1187–1188 (6th Cir. 1978).

■ No single fact is determinative of the voluntariness of a consent to search, but rather, voluntariness is to be determined "from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973). In that case the Supreme Court cited its previous decisions regarding the voluntariness of confessions, stating:

> In all of these cases, the Court determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted. [412 U.S. at 226, 93 S.Ct. at 2047]

*See United States v. Hearn*, 496 F.2d 236, 243–44 (6th Cir.), *cert. denied*, 419 U.S. 1048, 95 S.Ct. 622, 42 L.Ed.2d 642 (1974).

■ We hold that these principles were correctly applied by the District Court in its finding that Nance did voluntarily consent to the initial search of her apartment. The Court credited the clear and specific testimony of Sheriff Wilson, who testified that Nance said, "Yes, you can look." The Court observed that this testimony was consistent with Nance's own testimony that she had nothing to hide and had only wanted to leave, and also with her defense to the charge of knowingly harboring Scott.

The Court also found as fact that under the credible evidence no force or duress was present. The entry was peaceable, and the officers, not being certain that Scott was present in that particular apartment, had no reason to make any coercive inquiry. They followed Nance next door, but did not prevent her from leaving the apartment.

At most, one officer may have had a gun drawn; this, however, was a reasonable precaution, not a coercive gesture.

Furthermore, according to Nance's own testimony she had no idea at the time that Scott was wanted for bank robbery and assault with a dangerous weapon, and she knew of no reason that she would be suspected of wrongdoing. She therefore had no reason to believe that any threat to herself existed.

That Nance's initial consent was voluntary is also supported by her having given both oral and written consent to the second entry only one hour after Scott was arrested and the apartment sealed. Although Nance testified that she was greatly afraid from the time of the officers' initial approach until after her written consent was signed, she nevertheless consistently maintained that at the time of the written consent she was willing to let the officers search her apartment.

Nance's own testimony thus supports the inference that notwithstanding her fear she was at all times willing to cooperate with the police. On this record, we conclude that the findings of the District Court that the officers' actions at Nance's door were peaceable and noncoercive, and that Nance's will was not overborne thereby, were supported by substantial evidence and are not clearly erroneous.

Similarly, again according to Nance's own testimony, the second search, conducted pursuant to Nance's voluntary oral and written consent, was also proper.

## II

■ We also agree with the alternative holding of the District Court that the initial entry to arrest Scott was justified under the "exigent circumstances" exception to the warrant requirement. *Warden v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). In *United States v. Shye*, 492 F.2d 886, 891 (6th Cir. 1974), we adopted the standard to be followed in this Circuit with respect to when "the exigencies of the situation" make imperative an

entry to arrest a suspect, that is, when delay to obtain a warrant would endanger the lives of the officers or of others, as set forth in *Warden v. Hayden, supra.*

In *Shye* we approved the opinion of Chief District Judge Gray, following *Dorman v. United States,* 140 U.S.App.D.C. 313, 320–321, 435 F.2d 385, 392–93 (1970) (en banc), stating that there are seven considerations that would be material in determining whether the warrantless entry was justified.

The considerations are:

(1) That a grave offense is involved, particularly a crime of violence;

(2) the suspect(s) is (are) reasonably believed to be armed;

(3) a clear showing of probable cause;

(4) a strong reason to believe that the suspect(s) is (are) in the dwelling;

(5) the likelihood of escape if not swiftly apprehended; . . .

(6) a peaceable entry, as opposed to a "breaking;" and

(7) the time of entry (day or night). [492 F.2d at 891]

Only the third and fourth criteria are seriously questioned here. At the time the officers approached Nance's door they certainly had probable cause to believe that Scott was the bank robber they sought. Armed flight is a strong indication of guilt, and there had been a positive identification of Scott as the man who had shot Officer McGoldrick. It is obvious that Scott was fleeing from the scene of the robbery and was engaging in a gun battle with the police officers in order to escape with the loot on his person.

There was, however, only a suspicion at that time that Scott was in the apartment at 917 Graves Street. There was no evidence linking Scott with Nance. The officers knew only that Scott had friends on Graves Street; that he was last seen nearby; and that Smith's car, which Scott often used, was parked in front of that address. Although Agent Risner heard a "commotion" inside at the time the officers knocked, there was no indication that it was Scott who was alarmed by early-morning knocking at the front door.

Therefore, the officers' approach to Nance's door was at most investigatory. At that point there was no probable cause to support a search warrant, and the officers' only reasonable course was to knock, make inquiries, and if necessary, seek consent to search.

As in *Shye,* however, Nance's behavior, when she answered the door, was "an unexpected and intervening development, an event that . . . changed drastically the complexion of the entire situation and worsened the danger inherent therein." 492 F.2d at 892. We agree with the holding of the District Court that Nance's behavior, when the officers asked for Amos Scott, gave a fair inference that Scott was on the premises and that he might engage in a gun battle with the officers who were looking for him.

Therefore, at the time Nance ran out of the door with her little girl, there was probable cause to believe (1) that Scott had committed the robbery and the shooting; and (2) that he was then on the premises. Accordingly, the officers' entry to arrest Scott, although without a warrant, was justified.

### III

█ Scott also takes issue on appeal with certain of the District Court's instructions to the jury. The instruction on the issue of identity was as follows:

The evidence under Count I raises the question whether the defendant Scott was in fact the criminal actor and necessitates your resolving any conflict or uncertainty in testimony on that issue.

As explained, the burden of proof is on the prosecution with reference to every element of the crime charged and this includes the burden of proving beyond a reasonable doubt the identity of the defendant Scott as the perpetrator of the crime charged in Count I. [A. 151]

In our view, this instruction, Devitt & Blackmar, Federal Jury Practice and In-

structions § 15.18 (3d ed. 1977) fully preserved Scott's right to a fair trial.

■ Nevertheless, Scott requested that the District Court give to the jury the model instruction on identification testimony adopted by the District of Columbia Circuit in *United States v. Telfaire*, 152 U.S.App. D.C. 146, 152–153, 469 F.2d 552, 558–59 (1972), which instructs the jury specifically that it should consider (1) the capacity and opportunity of the witness to observe reliably the offender; (2) the question whether the identification was the product of a witness' own recollection, in view of the strength of the identification and the circumstances under which it was made; (3) the inconsistent identifications made by the same witness; and (4) the credibility of the witness.

The *Telfaire* instruction was adopted by the District of Columbia Circuit prospectively only, because, on the facts of that case, it appeared that any inadequacy in the charge as given was harmless. The instruction, or one substantially like it, has been favorably received in this Circuit, *United States v. O'Neal*, 496 F.2d 368, 373 (6th Cir. 1974), as well as in four other Circuits, *United States v. Roundtree*, 527 F.2d 16, 19 (8th Cir. 1975); *United States v. Hodges*, 515 F.2d 650, 652–53 (7th Cir. 1975); *United States v. Holley*, 502 F.2d 273, 275 (4th Cir. 1974); *United States v. Barber*, 442 F.2d 517, 528 (3d Cir. 1971).

All of these cases have emphasized that the model instruction need be given only when the issue of identity is crucial, *i. e.*, either where no corroboration of the testimony exists, or where the witness' memory has faded by the time of trial, or where there was a limited opportunity for observation.

In the present case, however, the identification by Officer Dexter of Scott as the man who shot Officer McGoldrick was not uncorroborated. Scott was in possession of the weapon used to shoot Officer McGol-

drick; he also was in possession of the recently stolen money; and he had a bullet wound in his left foot. Ski masks were also found. Officer Dexter was a trained police officer and was able to see Scott at least clearly enough to shoot him.

We agree with the decisions cited above that in appropriate cases the *Telfaire* instruction may be used at the discretion of the trial court to deal "realistically with the shortcomings and trouble spots of the identification process." 469 F.2d at 559 (Bazelon, C. J., concurring). In the present case, however, it is evident that the refusal to give such an instruction was without prejudice to the rights of the defendant.

## IV

■ Scott last contends that the District Court erred in denying his motions for a judgment of acquittal and for a new trial. The motions were based on the proposition that when the Government's evidence is wholly circumstantial it must be such as to exclude every reasonable hypothesis other than guilt.[1] Scott argues that there is insufficient evidence, under this standard, to support the verdict against him. Although there was substantial direct evidence linking Scott with the shooting of Officer McGoldrick, the only evidence linking him with the robbery was his armed flight from the scene, the shooting, and possession of part of the loot, all of which was strong circumstantial evidence of his guilt.

Scott's contention with respect to the standard of sufficiency of circumstantial evidence, however, is not consistent with settled law. In *Holland v. United States*, 348 U.S. 121, 139–40, 75 S.Ct. 127, 99 L.Ed. 150 (1954), the Supreme Court considered the claim that it was error not to charge a jury in accordance with the standard asserted here. The Court stated:

[P]etitioners assail the refusal of the trial judge to instruct that where the Government's evidence is circumstantial

1. An instruction to this effect was requested by counsel for defendant Smith. The instruction was rejected by the Court (A. 144a–145a), and Smith's counsel took exception (A. 158a). De-

fendant Scott did not join in either the request or the exception (A. 158a) and did not include this ground in his exceptions to the general charge of the Court to the jury.

it must be such as to exclude every reasonable hypothesis other than that of guilt. There is some support for this type of instruction in the lower court decisions [citing cases], but the better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect . . . .

This Circuit has followed the holding of *Holland*. *United States v. Eisner*, 533 F.2d 987, 989–90 (6th Cir. 1976); *United States v. Dye*, 508 F.2d 1226, 1231 (6th Cir. 1974); *United States v. Scales*, 464 F.2d 371, 373 (6th Cir. 1972).

Defendant Scott has cited a contrary decision of this Court, *United States v. La-Rose*, 459 F.2d 361, 363 (6th Cir. 1972), which followed the minority rule expressly disapproved in *Holland*. The *LaRose* Court cited only one Tenth Circuit case and one Fifth Circuit case as authority, and reached a result contrary to Sixth Circuit authority existing at the time, without citing either it or *Holland*. *United States v. Luxenberg*, 374 F.2d 241, 249 (6th Cir. 1967); *United States v. Conti*, 339 F.2d 10, 12–13 (6th Cir. 1964), (both *Luxenberg* and *Conti* citing *Holland*, as well as earlier Sixth Circuit cases).

Accordingly, the decision in *LaRose* can be regarded only as an aberration, and will not be followed by us in this case.

Viewing the evidence in the light most favorable to the Government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we hold that substantial and competent evidence supported the jury's verdict. *See United States v. Eisner*, 533 F.2d at 989–90. The jury was entitled to infer guilt from the facts in evidence, and to reject Scott's weak alternative theory of his actions on the night of March 4th and of his possession of the stolen money.

The judgment of conviction is affirmed.