OPINION OF THE COURT
PER CURIAM:
Appellant Samuel O. Rivera-Padilla was charged with possession of a gun by an illegal alien in violation of 18 U.S.C. § 922(g); making false statements to a federal firearms licensee in violation of 18 U.S.C. § 924(a)(1)(A); and making a false claim of United States citizenship in violation of 18 U.S.C. § 911. Prior to trial, he filed a motion to suppress evidence which was granted in part and denied in part. Rivera-Padilla then pled guilty, while preserving his right to appellate review of the District Court’s ruling denying the bulk of his suppression motion. We will reverse.
I.
The relevant facts are not in dispute. Special agents of the United States Immigration and Customs Enforcement Agency (“ICE”) arrived at Rivera-Padilla’s home in Reading, Pennsylvania, at 6:30 in the morning with an arrest warrant charging him with immigration offenses. Rivera-Padilla answered their knock on his front door wearing a pair of boxer shorts. He immediately acknowledged that he was the individual they were seeking. They handcuffed him in his living room and conducted a protective sweep of both floors of the home.
Special Agent Michael Pausic asked Rivera-Padilla where his clothes were and whether he had any identification. Rivera-Padilla told Pausic to go to the upstairs bedroom facing the street. When Pausic reached that bedroom, he saw a closed wallet lying on the bed. He seized the wallet, opened it, and searched its contents. He hoped to find confirmation of Rivera-Padilla’s identity and evidence of his country of origin. Among those contents was a gun permit. His inspection revealed that it belonged to Rivera-Padilla. Agent Pausic did not ask Rivera-Padilla to consent to the search or whether there was identification inside the wallet.
Agent Pausic, without informing Rivera-Padilla of his Miranda rights, called down the stairs to Rivera-Padilla and asked him where the firearm was. Rivera-Padilla responded that it was in a box in the closet of the same bedroom. Pausic located a lock-box on a shelf in the closet but was unable to locate a key. When asked, Riv *345 era-Padilla told him that the keys were on the dresser. In the lock-ox, Pausic found a handgun.[1] The agents then let Rivera-Padilla dress and drove him to the Philadelphia ICE facility, a trip that consumed an hour and a half to two hours.
The agents processed Rivera-Padilla and placed him by himself in a holding cell. Approximately five hours after his arrest in Reading, Pausic and another agent conducted the second interrogation of Rivera-Padilla. Pausic, who had conducted the earlier, unwarned interrogation of Rivera-Padilla, also led this second interrogation. This time, Pausic gave Rivera-Padilla the Miranda warnings. Rivera-Padilla acknowledged and waived his Miranda rights. Pausic then interviewed Rivera-Padilla. Rivera-Padilla confessed to ownership of the gun and to making false statements in the gun permit application.
Rivera-Padilla moved to suppress the gun, the gun permit, and his inculpatory statements. The District Court held that the search of the wallet and seizure of the gun permit were lawful. While it agreed with Rivera-Padilla that the inculpatory statements made in his home without Miranda warnings should be suppressed, it further held that this violation of his Fifth Amendment rights did not require suppression of the gun or the statements made at the ICE facility.
II.
By its very terms, the Fourth Amendment affords protection against unreasonable searches and seizures of a person’s “effects.” U.S. Const, amend. IV. Accordingly, a warrantless search of a closed wallet is an unreasonable search under the Fourth Amendment unless it is justified by one of the recognized exceptions to the warrant requirement. United States v. Berenguer, 562 F.2d 206 (2d Cir. 1977). Here, the government acknowledges that Rivera-Padilla did not consent to the search of the wallet. Nor does it contend that it was . a search of Rivera-Padilla’s person and surrounding area incident to his arrest. Rather, the government insists that Pausic’s actions were justified by the “plain view” exception to the Fourth Amendment warrant requirement.
The Supreme Court explained the “plain view” doctrine and the rationale behind it in Minnesota v. Dickerson, 508 U.S. 366, 875, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (citations omitted; brackets in original):
Under that doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.
The rationale of the plain-view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no “search” within the meaning of the Fourth Amendment — or at least no search independent of the initial intrusion that gave the officers their vantage point.
Agent Pausic was authorized to enter Rivera-Padilla’s home for the purpose of *346 arresting him. After accomplishing that task and associated precautionary measures, he decided that he would look for evidence tending to confirm Rivera-Padilla’s identity and establish his country of origin, a search which he was not authorized to make. While the plain view doctrine might arguably have extended his authority to seize such evidence had it been in plain view, no such evidence, or any other incriminating evidence, was in plain view. All that was in plain view was an ordinary wallet whose contents, in which Rivera-Padilla retained a reasonable expectation of privacy, were not visible. It was not until Pausic searched inside the wallet that the gun permit came into plain view. The plain view doctrine does not authorize an otherwise unauthorized search, even if it is a fruitful one. Indeed, the plain view doctrine does not authorize searches; by definition, it only authorizes seizures of items in plain view to which the officer has a right of access. See Dickerson, 508 U.S. at 375, 113 S.Ct. 2130.
In Berenguer, the Court of Appeals for the Second Circuit was confronted with a situation almost identical to the one before us. Berenguer was arrested in his apartment on a drug charge. After he had been shackled and placed on a bed, the arresting agents conducted a protective sweep of the apartment. They observed a billfold, which when searched was found to contain approximately $3,200 in $100 bills. The District Court declined to suppress the cash, relying on the “plain view” doctrine. The Court of Appeals reversed because that doctrine required that “the incriminating nature [of the seized item] must be immediately apparent,” and this requirement was clearly not met. Berenguer, 562 F.2d at 210. There, as here, the “billfold offered no immediately apparent evidence of an inculpatory nature. It was only after the billfold itself had been searched that the large denomination currency was revealed.” Id.
The “plain view” doctrine did not authorize the search of Rivera-Padilla’s wallet under the circumstances before us.[2]
III.
The government acknowledges that, if the search and seizure of Rivera-Padilla’s wallet were unlawful, the gun permit and the gun must be suppressed as “fruits of the poisonous tree.” Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). It insists, however, that Rivera-Padilla’s confession at the ICE facility would remain admissible evidence even if the wallet search and seizure violated the Fourth Amendment.
The parties agree on the factors to be considered in determining whether this confession was fruit of the Fourth Amendment violation: Miranda warnings do not alone break the causal connection between the illegality and the confession. They are, however, an important factor to be considered in determining whether the confession was obtained by exploitation of an illegal search and seizure. Also to be considered are the temporal proximity between the illegality and the confession, the presence of intervening circumstances, and “particularly, the purpose and flagrancy of the official misconduct.” Brown v. Illinois, 422 U.S. 590, 604, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). The government bears the burden of establishing, based on the totality of the circumstances, that *347 there was a break in the chain of causation between the constitutional violation and the later confession. Taylor v. Alabama, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982).
We conclude that the government has not carried its burden. Each step in the chain of events from the discovery of the gun permit to the confession of the crime of conviction followed directly and quickly from the preceding step. Agent Pausic immediately used the gun permit to extract incriminating statements from Rivera-Padilla and to find the gun. Thereafter, in the space of only a few hours all in uninterrupted detention, the permit, gun, and incriminating, un-Mirandavzed statements were used to extract a full confession. The temporal separation between the unlawful search and the confession was about five hours, and there were no intervening events to break the chain. Rivera-Padilla had no contact with anyone other than ICE agents, he was not taken before a magistrate, and he had no contact with a lawyer. And the misconduct of Agent Pausic was serious indeed. But for his utilization of the fruits of his Fourth and Fifth Amendment violations, we are confident there would have been no confession to the crime of conviction.
IV.
Rivera-Padilla mounts a second challenge to his conviction. He contends that the felon-in-possession statute, 18 U.S.C. § 922(g), under which he was convicted is unconstitutional on its face because it does not constitute a valid exercise of Congress’ authority under the Commerce Clause. He also insists that it is unconstitutional as applied to him in this case in the absence of evidence that his alleged intrastate possession of the gun was in or affected interstate commerce. Rivera-Padilla candidly acknowledges, however, that this Court has explicitly upheld the constitutionality of this statute despite consideration of these arguments, see United States v. Singletary, 268 F.3d 196 (3d Cir.2001), and that he asserts them here solely to preserve them.
V.
We will reverse the judgment of the District Court and remand with instructions to grant Rivera-Padilla’s motion to suppress in full.

. The District Court did suppress Rivera-Padilla's statement as to where in the house the gun was located, ruling that the fruit of the poisonous tree doctrine does not apply to Fifth Amendment violations, citing Oregon v. Elstad, 470 U.S. 298, 309, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). This issue was not appealed. As noted hereafter, however, the discovery of the gun was clearly a direct result of the illegal search of the wallet, absent which Agent Pausic would not have asked Rivera-Padilla about the existence or location of the gun.

. Here, as in Berenguer, ”[n]o claim is made here that the money was taken to the station house and inventoried for appellant's protection .... Such a claim would be inconsistent with the government’s contention that it seized evidence whose incriminating nature was readily apparent.” Berenguer, 562 F.2d at 211, n. 7.