815 F.2d 706
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Perry MELTON, a.k.a. Perry Milton, Defendant-Appellant.
 No. 85-3529.
 United States Court of Appeals, Sixth Circuit.
 March 23, 1987.
 
 Before JONES and NELSON, Circuit Judges, and EDWARDS, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Tried before a jury on charges of robbing a credit union and carrying a firearm while doing so, Mr. Perry Melton was convicted and sentenced to consecutive prison terms totaling 25 years. Mr. Melton raises numerous issues on appeal, the most significant of which concerns a troubling error in the trial court's charge on eyewitness identification. Finding that the instructional error was not prejudicial and that the other claims of error are not well taken, we shall affirm the conviction.
 
 
 2
 * At about 10:15 on the morning of December 4, 1984, two gunmen robbed a Fairfield, Ohio, credit union of approximately $20,000. Only one of the seven eyewitnesses to the robbery, credit union manager Nancy Carpenter, identified Mr. Melton as a robber. Miss Carpenter made this identification notwithstanding that the robber, as she testified, was wearing a ski mask that covered his whole face except for the eye area.
 
 
 3
 Three or four weeks after the robbery Miss Carpenter picked out Mr. Melton's picture from a photo-spread depicting six individuals standing in front of a height chart. Miss Carpenter was 5'5"' or 5'6"' in her high heels, and she testified that the robber was perhaps an inch taller than that. Mr. Melton is 5'8%.2d Only one other individual in the photo-spread was shorter than 5'9"'.
 
 
 4
 After establishing the sequence of events at the credit union on the day of the robbery, the prosecution called a William Black to the stand. Mr. Black testified that he had known Mr. Melton and his co-defendant, Thomas Rooks, for many years. In November of 1984, Mr. Black testified, Mr. Melton asked him whether he would be interested in participating in a robbery of the Fairfield credit union. Mr. Black said he declined. Sometime after the robbery, Mr. Black testified, there was a second conversation, in the course of which Melton boasted of the successful robbery and described the details of its execution. Finally, Mr. Black identified a handgun found by police in the vicinity of credit union on the date of the robbery as one he had seen in Mr. Melton's possession.
 
 
 5
 Mr. Black admitted that at the time of trial he himself was under indictment on two felony charges; that he had previously been convicted of the felony of breaking and entering; and that there was a misdemeanor conviction for theft in his record. The defense attempted to impeach Mr. Black with a letter he had written suggesting Melton was innocent; however, the letter may well have left the jury with the impression that Black and Melton were more than occasional partners in criminal activity.
 
 
 6
 Additional testimony implicating Mr. Melton was provided by his girlfriend, Christine Covington. Miss Covington testified that Rooks and Melton had discussed the robbery at a party a few days afterwards. She also corroborated earlier testimony that Melton had been at the credit union a few days before the robbery and thus had an opportunity to "case" the place.
 
 
 7
 Mr. Melton did not testify, but his sister testified that Mr. Melton had been staying with her in late 1984 and that on the morning of the robbery she arrived home sometime after 11 a.m. to find Melton just getting up, as she thought. The government introduced testimony that a trip from the credit union to the home of Melton's sister could be made in a little over half an hour.
 
 
 8
 Messers Melton and Rooks are both Caucasians, and the defense introduced a Fairfield Police Department report one entry in which indicated that one of the robbers was black. The policeman who filled out the report explained under defense questioning that this entry was based on a remark by an eyewitness that one of the robbers "sounded black." (Miss Carpenter testified that the skin around the eyes of the robber she had identified as Melton appeared white.)
 
 
 9
 Finally, defense counsel elicited testimony from a federal agent that no handgun or substantial sum of money was recovered during a limited search of Mr. Melton's apartment and part of the basement of the house where the apartment was located. The agent stated that two pocket knives had been recovered, and on cross-examination by the prosecutor the agent testified that a ski mask and leather gloves had also been discovered. These items were then introduced as government exhibits.
 
 II
 
 10
 Although requested to do so by the defense, the district court declined to give a jury instruction on eyewitness identification patterned on United States v. Telfaire, 469 F.2d 552, 558-59 (D.C.Cir.1972). That instruction would have informed the jury that the value of an eyewitness identification depends on such factors as the witness's opportunity to observe the offender at the scene of the crime and the circumstances of any subsequent identification. Instead, the district court gave the following instruction:
 
 
 11
 "You have heard testimony from eye witnesses regarding pre-trial identification of a participant in the robbery of the Triangle Credit Union. Identification was made from photographs.
 
 
 12
 An identification may be made through the perception of any of the witness's senses. Identification testimony may be treated by you as a statement of fact by the witness. Identification by photograph is improper only if procedure used was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."
 
 
 13
 The trial court also told the jury that the robbery "occurred under conditions of extreme stress, excitement, terror, [and] the whole atmosphere of the event should be taken into account." Mr. Melton argues that the former instruction was erroneous, that it improperly bolstered Miss Carpenter's identification testimony, and that the Telfaire instruction ought to have been given instead.
 
 
 14
 We agree that it was error for the district court to tell the jury that photo-spread identification is "improper" only if so "impermissibly suggestive" as to give rise to a likelihood of misidentification. The question of propriety is for the court, not the jury, and the "impermissibly suggestive" test is one used by courts in deciding whether identification testimony will be admitted at trial. United States v. Merkt, 794 F.2d 950, 957 (5th Cir.1986); United States v. Goodman, 797 F.2d 468, 470 (7th Cir.1986). It was not up to the jury to decide whether the photo-spread procedure was so impermissibly suggestive as to make the results of that procedure inadmissible, and there is no contention here that Miss Carpenter ought not to have been allowed to testify about the picture she had picked out of the photo-spread. Mr. Melton does contend--correctly, we believe--that a Telfaire instruction would have been helpful to the jury in evaluating that testimony, whereas the instruction actually given was not.
 
 
 15
 Notwithstanding the trial court's error, we think this is a case where one can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." Kotteakos v. United States, 328 U.S. 750, 765 (1946).
 
 
 16
 The jury was made fully aware of the weaknesses in Miss Carpenter's photo spread and in-court identifications of Melton. Miss Carpenter testified that the robbery was one of the most frightening experiences of her life; that she had looked at the gunman for perhaps a minute; and that the ski mask completely covered the robber's face except for the area surrounding the eyes. On cross-examination defense counsel had Miss Carpenter demonstrate to the jury with her hands how much of the robber's face she could see. Defense counsel pointed out, with Miss Carpenter's concurrence, that she had not immediately indicated to police that there was something unusual about the robber's eyes that would permit her to make an identification.
 
 
 17
 The photo-spread, which consisted of front and side views of six individuals standing before a height chart, was received in evidence as an exhibit. Two of the individuals depicted were taller than 6'2"', and two others were taller than 5'9"'. Miss Carpenter conceded that only the remaining two were about the right height. Miss Carpenter responded "yes" to the question "so ... of all of the photographs on that page, only one of them fits the most general description of the robber isn't that right?" On re-direct, moreover, Miss Carpenter disclosed that in making her photo identification she had relied more heavily on the height of the individuals than on the eyes.
 
 
 18
 The prosecutor touched only briefly on Miss Carpenter's identification in his closing argument, but defense counsel attempted to elevate the significance of that testimony by telling the jurors that they might "very well ... conclude that the most important issue in this case is the eye witness, Nancy Carpenter." Counsel then proceeded to point out the weaknesses in her identification, including a reference to the photo identification being based on "not the eyes, but primarily the height."
 
 
 19
 Although the Telfaire instruction would have been helpful here, this court has said that such an instruction "need be given only where there is a danger of misidentification due to lack of corroborative evidence." United States v. Boyd, 620 F.2d 129, 131-2 (6th Cir.), cert. denied, 449 U.S. 855 (1980). Here the danger of misidentification was minimized by the corroborative testimony of Mr. Black and Miss Covington. In neither of the cases relied on most heavily by Mr. Melton, United States v. O'Neal, 496 F.2d 368 (6th Cir.1974), and United States v. Scott, 578 F.2d 1186 (6th Cir.), cert. denied, 439 U.S. 870 (1978), did this court reverse for a failure to give a Telfaire instruction. The instruction given by the district court in this case was erroneous, but we do not read it as somehow vouching for the identification. On the contrary, the court specifically told the jury to consider the circumstances of the robbery when determining the witnesses' credibility. The error, while disturbing, was harmless.
 
 III
 
 20
 Prior to trial Mr. Melton's attorney moved for a severance, contending, among other things, that Miss Covington's testimony as to statements made by co-defendant Rooks might unfairly prejudice Melton. The district court overruled the motion and proceeded with a joint trial. In Mr. Melton's later motion for a new trial (which was also overruled), he argued that Miss Covington's testimony as to jointly inculpatory statements by Rooks was inadmissible hearsay. Its receipt in evidence violated the Confrontation Clause, he contended, Rooks having exercised his privilege against self-incrimination and declined to testify.
 
 
 21
 Christine Covington was the penultimate witness presented by the prosecution. Immediately after she was sworn defense counsel informed the court at sidebar that he expected Miss Covington to testify that "she heard Thomas Rooks state that Perry Melton was involved in the robbery." Defense counsel submitted that the hearsay rule rendered such testimony inadmissible as against Melton because no conspiracy had been charged. The district court ruled that she could not testify as to what Rooks had said about Melton "unless it was in Melton's presence." Melton's counsel then requested an opportunity to question Miss Covington on voir dire, suggesting that her testimony could be "absolutely devastating and extremely prejudicial." The district court refused the voir dire, deciding to "take this on a question by question basis" and relying on the prosecutor's representation that Miss Covington "is going to testify what Melton told her and she's going to testify what Rooks told her, [and] that she heard them talking to each other. That's it."
 
 
 22
 Miss Covington subsequently testified, in the presence of the jury, that a few days after the robbery she, Rooks, and Melton were at Debbie Brewer's apartment consuming alcohol and marijuana:
 
 
 23
 "Q. ... [D]o you recall being at Debbie Brewer's house with Perry Melton and Thomas Rooks?
 
 
 24
 A. Yes.
 
 
 25
 Q. Do you remember a conversation that the two of them had regarding the Credit Union?
 
 
 26
 A. Yes.
 
 
 27
 Q. What did they say?
 
 
 28
 A. He said that--
 
 
 29
 Q. Tell us who you mean by he and keep your voice up, please.
 
 
 30
 A. Pony, Tom Rooks.
 
 
 31
 Q. Pony was telling Perry?
 
 
 32
 A. About them going in the place, Credit Union, and Tom said to Perry something about the guy didn't think it was for real. The guy walked in and Tom--Pony said it was for real, this is a hold up or something.--
 
 
 33
 Q. He was talking to Perry Melton at this time?
 
 
 34
 A. Yes.
 
 
 35
 Q. What else was said?
 
 
 36
 A. I guess something about somebody went up and got the money.
 
 
 37
 Q. Who said that?
 
 
 38
 A. Both of them was talking.
 
 
 39
 Q. Pony?
 
 
 40
 A. Yeah.
 
 
 41
 Q. Who did he say went up and got the money?
 
 
 42
 A. They both was talking, but I don't know which one said who got the money."
 
 
 43
 The prosecutor then inquired into a later conversation regarding the credit union at another party at Debbie Brewer's apartment. Miss Covington offered little that was new, testifying only that Rooks, in the presence of Melton and others, said "about the same, that they said before.... [Rooks] told the man that it was for real and to lay down...."
 
 
 44
 In response to a question by Rook's lawyer as to what Tom Rooks "exactly said" in the first conversation, Miss Covington testified:
 
 
 45
 "Well, I can only remember him saying him and Perry [Melton] went in and I heard him say something about the man said this was a joke. I just got little bits and pieces."
 
 
 46
 A few questions later Miss Covington denied that she had heard Rooks say that he had gone into the credit union. As to the second conversation, Rooks' attorney was able to elicit an admission that Miss Covington was not absolutely certain that the comments were made by Rooks.
 
 
 47
 After Miss Covington was excused, Mr. Melton's counsel approached the bench and said that he thought he had heard Miss Covington testify that "Perry Melton and Thomas Rooks both went into the Credit Union." "This," he said, "is exactly the kind of highly prejudicial situation that I was referring to." Counsel did not dispute the fact that Rooks' inculpatory statement was made in the presence of Melton. Counsel did, however, request that he be allowed to attack Rooks' credibility. The trial judge refused to permit evidence of Rooks' criminal record, but said he would allow Miss Covington to be called during the presentation of Mr. Melton's defense, "to ask this witness ... what is her opinion of the credibility of Mr. Rooks." The court chose to defer such examination because Miss Covington was "barely coherent" and "barely intelligible." (In closing argument, the prosecutor reminded the jury that Miss Covington "was in tears at times.")
 
 
 48
 We are not persuaded that the jointly inculpatory statement made by Rooks, as overheard and reported by Miss Covington, was inadmissible as against Melton. Rule 804(b)(3), Fed.R.Evid., provides that certain statements against interest are not excluded by the hearsay rule if the declarant is "unavailable" as a witness. Rooks having exercised his privilege against self-incrimination, he was unavailable under the rule. United States v. Stratton, 779 F.2d 820, 828 (2d Cir.1985); cert. denied, 106 S.Ct. 2285 (1986); Rule 804(a)(1), Fed.R.Evid.; United States v. Toney, 599 F.2d 787, 790 (6th Cir.1979). The statements by Rooks, which described his own participation in the robbery, qualified as the kind of statements against interest covered by Rule 804(b)(3) because they "so far tended to subject him to civil or criminal liability" that a "reasonable man in his position would not have made the statement unless he believed it to be true." That Rooks made the jointly inculpatory statement to Melton or to a small group including Melton is an additional indicium of trustworthiness. Stratton, 779 F.2d at 829. Although Melton has contended otherwise, there is no requirement that a finding of conspiracy be made before such jointly inculpatory statements can be admitted. United States v. Harrell, 788 F.2d 1524, 1526 (11th Cir.1986).
 
 
 49
 Melton also charges a Confrontation Clause violation. "Though a hearsay exception does not end the Confrontation Clause analysis, see, e.g. California v. Green, 399 U.S. 149, 155-56, 90 S.Ct. 1930, 1933-34, 26 L.Ed.2d 489 (1970), a finding of reliability sufficient to admit a statement against penal interest will normally satisfy Sixth Amendment concerns." United States v. Stratton, 779 F.2d at 830. This court has observed that the Sixth Amendment permits introduction of out-of-court statements when
 
 
 50
 "... the declarant is unavailable and that his statements bear adequate 'indicia of reliability'. Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980); Stevens v. Bordenkircher, 746 F.2d 342, 347 (6th Cir.1984); United States v. Licavoli, 725 F.2d at 1049. If the hearsay testimony falls within an established hearsay exception, its reliability can be inferred. Ohio v. Roberts, 448 U.S. at 66, 100 S.Ct. at 2539. If, however, an established exception to the hearsay rule does not apply, 'the [hearsay testimony] must be excluded, at least absent a showing of particularized guarantees of trustworthiness.' Id." Fuson v. Jago, 773 F.2d 55, 59 (6th Cir.1985), cert. denied, 106 S.Ct. 3334 (1986).
 
 
 51
 Although a jointly inculpatory confession made while in custody does not come within the hearsay rule exception for purposes of Confrontation Clause analysis, Fuson v. Jago, 773 F.2d at 60-61 (applying Ohio evidentiary law); Lee v. Illinois, 90 L.Ed.2d 514 (1986), Rooks' statement was not made while he was in custody--it was made at a party in the company of friends (including Melton), and it possessed the trustworthiness demanded by the Confrontation Clause.
 
 
 52
 The joint trial was proper because Melton and Rooks were "alleged to have participated in the same act or transaction ... constituting an offense...." Rule 8(b), Fed.R.Crim.P. Because the jointly inculpatory statement was excepted from the hearsay rule, and there was no violation of the Confrontation Clause, the district court obviously did not abuse its discretion in denying Melton's motions for severance under Rule 14, Fed.R.Crim.P. "[D]efendant must make a showing of compelling prejudice before the trial court's ruling denying a Rule 14 severance will be disturbed." United States v. Warner, 690 F.2d 545, 552 (6th Cir.1982). Nor was severance required simply because Miss Covington's testimony might have been more damaging to Rooks than to appellant. The "jury must be presumed capable of sorting out the evidence and considering the case of each defendant separately." Id. at 553.
 
 IV
 
 53
 Like the district court, we deplore the prosecutor's failure to make available to the defense the police report that indicated one of the robbers was black. Nonetheless, we find no substance in the claim that Mr. Melton is entitled to a new trial under Brady v. Maryland, 373 U.S. 83 (1963), because of the withholding of the report.
 
 
 54
 The record discloses that through its own efforts the defense obtained a copy of the police report on April 15, 1985. The jury was not impanelled until April 22. The defense had possession of the report a full week before the first prosecution witness took the stand, and no continuance was requested on the basis of the report.
 
 
 55
 Delay in disclosure of exculpatory material only requires a new trial under Brady if it comes too late to aid the defendant. United States v. Davenport, 753 F.2d 1460, 1462 (9th Cir.1985) ("Disclosure, to escape the Brady sanction, must be made at a time when the disclosure would be of value to the accused."); United States v. Allain, 671 F.2d 248, 255 (7th Cir.1982) ("As long as ultimate disclosure is made before it is too late for the defendant to make use of any benefits of the evidence, Due Process is satisfied."); United States v. Darwin, 757 F.2d 1193, 1201 (11th Cir.1985), cert. denied, 106 S.Ct. 896 (1986) ("[D]efendant must show that the failure to earlier disclose prejudiced him because it came so late that the information disclosed could not be effectively used at trial.")
 
 
 56
 Here the exculpatory report, possessed by the defense a week before trial, was received in evidence as a defense exhibit. Its author was called to the stand by the appellant. Although the officer first testified that a teller named Trina Balfour had told him that one robber "sounded black," the officer changed his story the next morning and testified that it was a Murta Burns who had made that comment. Both Balfour and Burns, and their telephone numbers, were listed on the police report, and there has been no showing that the defense could not have contacted them during the week before trial. The district court did not err in refusing to declare a mistrial on Brady grounds.
 
 
 57
 The remaining defense arguments do not merit comment. The judgment is AFFIRMED.