**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Rodney L. TIPTON (92–6286); and
Robert A. Davis (92–6287),
Defendants–Appellants.**

Nos. 92–6286, 92–6287.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 13, 1993.

Decided Dec. 13, 1993.

Rehearing Denied Feb. 25, 1994.

Robert E. Simpson, Asst. U.S. Atty., David
G. Dake, U.S. Atty., Ed Schmutzer, Asst.

U.S. Atty. (argued and briefed), Knoxville, TN, for U.S.

Randall E. Reagan (argued and briefed), Knoxville, TN, for Rodney L. Tipton.

James Earl Wagner (argued and briefed), Frantz, McConnell & Seymour, Knoxville, TN, for Robert Allen Davis.

Robert Allen Davis, pro se.

Before: MARTIN and JONES, Circuit Judges; and DEMASCIO, Senior District Judge.*

NATHANIEL R. JONES, Circuit Judge.

Defendants appeal their convictions for kidnapping and transporting the victim across state lines (in violation of 18 U.S.C. § 1201(a)(1)), and using a firearm during a crime of violence (in violation of 18 U.S.C. § 924(c)). They claim that the trial court: (1) failed to give a required jury instruction; (2) submitted the case to the jury on insufficient evidence; (3) improperly applied the sentencing enhancement for "serious bodily injury"; (4) made prejudicial comments during trial; and (5) unlawfully sentenced Defendants for conduct for which Defendants had been previously sentenced in state court.

We find that the trial court's failure to give the jury instruction was not reversible error, and that the other four claims are without merit. Accordingly, we affirm both the convictions and the sentences. Both parties agree, however, that the trial court's judgment in the case incorrectly states that the victim was held for ransom; it should be corrected to reflect that she was kidnapped and "held for ransom, reward or otherwise."

## I. Facts

According to the testimony of Cynthia Cheryl Blair, on January 7, 1991, at around midnight, Blair had just gotten into her car in a grocery store parking lot in Maryville, Tennessee, when she noticed a small, silver or silver-beige car pull up behind her. The car looked like a Toyota or a Datsun. Then, a man wearing a ski mask and wielding a gun forced his way into Blair's car. At trial, Blair identified the man as Defendant Robert Davis. While Davis drove the car, Blair thought she saw the silver car from the parking lot following them. Davis instructed Blair to cover her face with a towel so that she could not see his "buddy" or his "buddy's car." He then stopped and picked up a man whom Blair identified at trial as Defendant Rodney Tipton.

After driving some distance and taking Blair's money to buy gas, Davis stopped the car. The two men pulled Blair from the car, undressed her, forced her to perform oral sex on both of them, and raped her. Tipton also sodomized her. They then allowed her to dress, and replaced the towel with the ski mask, placed backwards over her head so that she could not see. They re-entered the car, placing Blair on Tipton's lap in the passenger seat. Tipton went through Blair's purse, which contained $300. After they stopped to buy beer and liquor, the defendants removed Blair's clothes again, put her back on Tipton's lap, and Tipton raped her while Davis drove.

Looking for a motel, Davis drove the car across the Tennessee border into North Carolina. He stopped at a motel that Blair later identified as the Crossroads of Time Motel. While Davis was out of the car arranging for a room, Blair lifted her mask over one eye and reached for a gun that was on the dashboard. Tipton grabbed her arm and the mask fell off of her head. She then saw Tipton's face from about one foot away, illuminated by a bright overhead light approximately 25 feet away. Within a few seconds, Tipton managed to wrestle the gun away from her and to pull the mask back over her head. He threatened to kill her.

Davis returned. The men told her to get dressed, and then removed her mask, instructing her to cover her eyes. She managed to see the outside of the motel while they pulled her into the motel room. Inside, they replaced the mask. Davis raped her again. Then, Tipton shoved the gun to her vagina and threatened to "blow her away."

---

* The Honorable Robert E. DeMascio, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

Davis talked him into raping her again instead. One of the men removed the ski mask in order to kiss her face. She tried not to see the men's faces, but she did see part of the motel room clearly. After they got dressed, Davis blindfolded her with a pillowcase from the motel room, and they returned to the car.

After driving for a while, they stopped and Davis raped her again. Some time later, Tipton got out and left. Davis continued driving. Soon after, Davis lost control of the car, swerved off of the road and into a ditch. Davis went to a nearby trailer to ask for help. Willis Bivens came out of the trailer and tried, unsuccessfully, to pull the car out. Then Bivens drove Davis and Blair to the Fort Louden Motel in Vonore, Tennessee. Once they were inside a motel room, Davis fell asleep, and Blair crept out. She went to the motel office and asked the clerk, Joyce Atkins, to call the police. The police arrived within a few minutes and arrested Davis. According to the testimony of one of the police officers, they found the pillowcase from the Crossroads of Time Motel in the Fort Louden Motel room.

After Blair made a statement to the police at the motel, she was taken to a hospital. The next day, she worked with Detective David Michael Graves of the Maryville Police Department in order to make a detailed composite picture of Tipton, though she did not yet know his name. Detective Graves testified that he passed the composite onto investigators without having any name associated with the picture. Officer Randall Merks of the Blount County Sheriff's Department testified that, when he received the picture, he felt it resembled Tipton. He presented Blair with an array of six photographs, from which she selected an eight year old photograph of Tipton. Tipton was arrested shortly thereafter.

Blair's testimony was plausible, consistent, and surprisingly detailed. Many details in her testimony were corroborated by Joyce Atkins, Willis Bivens, Vonore Police Chief Harold Davis, Crossroads of Time Motel worker Ricky Hartsell, Detective Graves, Officer Merks, and gas station owner Ben Underwood. The jury saw the composite pic-

ture; apparently, they agreed that it looked like Tipton.

In addition, Tipton's girlfriend, Peggy Cooper, testified that, as of January 7, 1991, she and Tipton were living together in a trailer approximately five minutes from the grocery store parking lot where Blair was abducted. That evening, Tipton had left with Davis in Tipton's grey Datsun. Tipton did not return home until the next morning.

Cooper's testimony was contradicted by the testimony of a friend of Tipton's, Clifford Leroy Parker, who stated that Tipton sold his grey Datsun on January 4, 1991, and that Parker never saw Tipton with it again. Parker also testified that he had never seen Tipton carrying a pistol before.

The testimony of people who examined Blair on January 8, 1991, Dr. Edmund Lane and X-ray department head Rita Richesin, revealed that Blair was bruised, but not in the vaginal or anal areas. Dr. Lane testified that "there was a possibility that [Blair] had been raped," but no physical proof of it.

There was no physical evidence—no fingerprints, hair, or semen—linking Tipton to the crime. The only evidence that Tipton was one of the perpetrators was Blair's description of her assailant and her identification of Tipton based upon Blair's having seen him for only a few seconds during the struggle for the gun in the parking lot of the Crossroads of Time Motel.

The defendants had already been tried and sentenced in Tennessee state court when trial was held in federal court on January 7–9, 1992. The federal jury found both Defendants guilty on both counts. The district court sentenced Davis to 262 months imprisonment on the kidnapping charge and 60 months on the firearm charge. It sentenced Tipton to 188 months on the kidnapping charge and 60 months on the firearm charge. This appeal followed.

## II. Discussion

### A. Jury Instruction on Identification

Tipton contends that the district court erred by denying his request for a specific jury instruction on eyewitness identification

testimony. Tipton's proposed instruction was taken almost verbatim from *United States v. Telfaire,* 469 F.2d 552, 558–59 (D.C.Cir.1972). It was approved by the Sixth Circuit in *United States v. O'Neal,* 496 F.2d 368, 373 (6th Cir.1974), and *United States v. Scott,* 578 F.2d 1186, 1191 (6th Cir.), *cert. denied,* 439 U.S. 870, 99 S.Ct. 201, 58 L.Ed.2d 182 (1978).

■ The *Telfaire* instruction explains that "you, the jury, must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you may convict him." 469 F.2d at 558. Further, the instruction specifically informs the jury that it should consider:

> (1) the capacity and opportunity of the witness to observe reliably the offender; (2) the question whether the identification was the product of a witness' own recollection, in view of the strength of the identification and the circumstances under which it was made; (3) the inconsistent identifications made by the same witness; and (4) the credibility of the witness.

*Scott,* 578 F.2d at 1191 (summarizing *Telfaire* ).

Although the Sixth Circuit has held that giving the *Telfaire* instruction is a matter of discretion for the trial court, it has, at the same time, stressed that it needs to be given "when the issue of identity is crucial, *i.e.,* either where no corroboration of the testimony exists, or where the witness' memory has faded by the time of trial, or where there was a limited opportunity for observation." *Id.;* see also *United States v. Boyd,* 620 F.2d 129, 131–32 (6th Cir.) (identification instructions "need be given only where there is a danger of misidentification due to lack of corroborative evidence."), *cert. denied,* 449 U.S. 855, 101 S.Ct. 151, 66 L.Ed.2d 69 (1980).

Tipton argues that, in the present case, the issue of identification is indeed crucial. He points out that Blair's identification testimony is the only evidence connecting Tipton to the crime. Furthermore, her identification was based on her viewing her assailant's face for only a few seconds, under poor lighting conditions, during a struggle, after a harrowing ordeal.

The government responds that Blair managed to describe her assailant without any problems and in great detail. The resulting composite drawing was passed without a name attached from Detective Graves to investigators working on the case. Officer Merks felt the composite looked like Tipton, and he then put together the photo array that led to Blair's identification of Tipton. The government stresses that Peggy Cooper's testimony—Tipton was with Davis on the evening of January 7, 1991, in a gray Datsun, and was out all night—corroborates Blair's testimony. In addition to arguing that the *Telfaire* instruction was not necessary in the present case, the government also argues briefly that the trial judge's instructions were adequate.

We find the government's arguments unconvincing. The district court did err in declining to give the *Telfaire* instruction. Despite the clarity of Blair's description and the existence of Cooper's corroborating testimony, this is undeniably a case in which there was only a limited opportunity for identification, and so the issue of identification was crucial. As per *Scott,* the failure to give the *Telfaire* instruction was an abuse of discretion. Further, the trial court's instructions, while generally encompassing the four elements of the *Telfaire* instruction,[1] did not

---

1. *Compare Scott,* 578 F.2d at 1191 (quoted above), *with* the jury instructions that were given by the trial judge in the present case:

Part of your job as jurors is to decide how believable each witness was. This is your job and not mine. Now, it's up to you to decide if a witness' testimony was believable and how much weight you think it deserves. You are free to believe everything that a witness said or only part of it or none of it at all; but you should, of course, act reasonably and carefully in making these decisions.

Now let me suggest some things for you to consider in evaluating each of the witness' testimony. First, ask yourself if the witness was able to clearly see or hear the events. Sometimes even an honest witness may not have been able to clearly see or hear what was happening and may make a mistake.
Next, ask yourself how good the witness' memory seemed to be. Did the witness seem able to accurately remember what happened?
Next, ask yourself how the witness looked and acted while testifying. Did the witness seem to

expressly relate these factors to the issue of accuracy of identification in the way that the *Telfaire* instruction would have.

Nevertheless, we are not prepared to reverse on this ground. Once we find that the trial court erred, then the question becomes whether the error was prejudicial. In the case of *United States v. Melton*, 1987 WL 36828, 1987 U.S.App. LEXIS 3705 (6th Cir. March 23, 1987) (unpublished per curiam), only· one witness to a robbery identified the defendant. She saw him for only ·a minute, during what she described as one of the most frightening experiences of her life, and a ski mask completely covered· the robbers face except for the area surrounding the eyes. She identified the defendant through a photo array. *Id.*, 1987 WL 36828 at *3, 1987 U.S.App. LEXIS 3705 at *7. The defendant requested that the trial court give the *Telfaire* instruction. The court declined to do so, and instead gave an instruction on determining whether the photo array was "impermissibly suggestive." *Id.* 1987 WL 36828 at *2, 1987 U.S.App. LEXIS at **4–6.

We held that it was error to give the instruction on the photo array, and that "a *Telfaire* instruction would have been helpful to the jury in evaluating [the] testimony." *Id.* 1987 WL ˙36828 at *2, 1987 U.S.App. LEXIS at *6. However, we further held that the error was harmless. First, we

stressed that "The jury was made fully aware of the weaknesses in [the witness's] photo spread and in-court identifications of Melton," both from the witness's testimony and from the defense counsel's closing argument. *Id.* 1987˙ WL 36828 at *3, 1987 U.S.App. LEXIS at *7. Second, we stressed that the danger of misidentification was minimized by corroborative testimony. *Id.* 1987 WL 36828 at *3, 1987 U.S.App. LEXIS at *8. Third, we pointed out that the Sixth Circuit has not yet actually reversed for a failure to give a *Telfaire* instruction. *Id.*, 1987 WL 36828 at *3, 1987 U.S.App. LEXIS at *9 (referring to *O'Neal*, 496 F.2d at 373; *Scott*, 578 F.2d at 1191; *Boyd*, 620 F.2d at 131–32).[2] Fourth, we recognized that "the court specifically told the jury to consider the circumstances of the robbery when determining the witnesses' credibility." *Id.* We concluded that "[t]he error, while disturbing, was harmless." *Id.*

In *Telfaire* itself, the court declined to find prejudicial error in the failure to give a cautionary identification instruction, because the "proof, contentions and general instructions may have so shaped the case as to convince us that in any real sense the minds of the jury were plainly focused on the need for finding the identification of the defendant as the offender proved beyond a reasonable doubt." 469 F.2d at 556. This passage from

---

be honestly trying to tell you what happened or did the witness seem to be lying?

Next, ask yourself if the witness had any relationship to either side of the case or anything to gain or lose that might influence the witness' testimony and ask yourself if the witness had any bias or prejudice or reason for testifying that might cause the witness to lie or to slant testimony in favor ·of one side or the other.

Next, ask yourself if the witness testified inconsistently while on the witness stand or if the witness said or did anything off the stand that is inconsistent with what the witness said while testifying. Now, if you believe that the witness was inconsistent, then go further and ask yourself if this makes any difference to the witness' testimony and makes it less believable. Sometimes it may, other times it may not. Consider whether the inconsistency was about something important or about some unimportant detail, and ask yourself if it seems like an innocent mistake or if it seemed deliberate. Now, finally, ask yourself how believable the witness' testimony is in light of all the other

evidence in the case. Was the witness' testimony supported or contradicted by other evidence that you found believable? Now, if you believe that a witness' testimony was contradicted by other evidence, remember that people sometimes forget things and that even ·two honest people who witness the same events may not describe it exactly the wame way. Now, ladies and gentlemen of the jury, these are only some of the things that you may consider in deciding how believable each witness was. You may also consider other things that you think shed some light on the witness' believability. Use your common sense and your everyday experience in dealing with other people and then decide what testimony you believe and how much weight you think it deserves.

J.A. at 298–300.

**2.** Even since *Melton*, it remains true that this Circuit has not yet reversed for a failure to give a *Telfaire* instruction.

*Telfaire* was quoted with approval in *Guster v. Taylor*, 709 F.2d 1502 (6th Cir.1983) (unpublished order dismissing petition for writ of habeas corpus). In *Guster*, the court found that the lack of a *Telfaire* instruction did not deny the defendant a fair trial where "[t]he petitioner does not show in any way how the so-called Telfaire instruction would have focused the jury's attention on issues which were not already accentuated by defense counsel throughout the trial." *Id.*

From *Telfaire* and *Melton*, it follows that, where identification of a criminal defendant is a crucial issue, the failure to give a *Telfaire* instruction is a "disturbing but harmless" error if: (1) the "proof, contentions and general instructions may have so shaped the case as to convince us that in any real sense the minds of the jury were plainly focused on the need for finding the identification of the defendant as the offender proved beyond a reasonable doubt"; (2) the jury was made fully aware of the weaknesses in the identifications at issue from the testimony and closing arguments; (3) the danger of misidentification was minimized by corroborative evidence; and (4) the court specifically told the jury that, when determining witnesses' credibility, it should consider the circumstances that the witnesses were in. *Telfaire*, 469 F.2d at 556; *Melton*, 1987 WL 36828 at *3, 1987 U.S.App. LEXIS 3705, at **7–9.

From the record in the present case, we know that all four factors apply. As for factor (1), the minds of the jurors were clearly directed to the government's burden to prove beyond a reasonable doubt that Tipton was Blair's assailant. Tipton's attorney stressed that the issue of identification was crucial in his opening statement, throughout his cross-examination of most of the witnesses, and in his closing statement.[3] In the latter, he connected the identification issue with the reasonable doubt standard.[4] Moreover, the court instructed the jury that each defendant enjoys a presumption of innocence until the government proves each one guilty beyond a reasonable doubt, and the court stressed that the government must prove each element of the crime beyond a reasonable doubt.[5]

Similarly, Tipton's counsel's closing statement and his cross-examinations of some of the witnesses made the jury aware of the weaknesses inherent in Blair's identification of Tipton.[6] Thus, factor (2) applies. As for factor (3), there is ample corroboration of Blair's identification of Tipton. Not only was Cooper's testimony corroborative, but also the composite picture taken from Blair's detailed description of her assailant closely resembles Tipton. Similarly, the record indicates that factor (4) applies.[7]

---

**3.** In the first paragraph of his opening statement to the jury, Tipton's attorney said: "Rodney Tipton wasn't there. It is for you to decide whether Ms. Blair is lying or whether she's mistaken. We don't know. Rodney Tipton wasn't there." R. 147 at 73 (Volume I of the Trial Transcript, Jan. 7, 1992). Tipton's counsel proceeded to tell the jury how they would know that Tipton was not there. *Id.* at 73–74.

When he cross-examined Blair, and Detective Graves, Tipton's attorney's questions pointed to the lack of physical evidence connecting Tipton to the crime, and to the possibility that the silver car Blair saw was not Tipton's. *Id.* at 202–19, 245–46. He brought out that Blair only saw the assailant she identified as Tipton for a few seconds, after being awake for sixteen hours, at night, illuminated only by an outdoor security light. *Id.* at 212–13. His cross-examination of several witnesses consisted of little more than determining that the witnesses could not identify Tipton. J.A. at 190–91, 206, 228, 284; R. 148 at 101 (Volume II of the Trial Transcript, Jan. 8, 1992).

Tipton's counsel began his closing argument by reminding the jury, "I told you at the very beginning, we don't know what happened because Rodney Tipton wasn't there. It's for you to decide what happened as to Mr. Davis and what happened as to Ms. Blair; but what have you seen today, that tells you that Rodney Tipton wasn't there." R. 148 at 134. He reminded the jury of the lack of fingerprints, hair, or semen from Tipton, of Blair's alleged confusion about the make of the silver car, and of the adverse conditions that allegedly cast doubt upon Blair's identification of Tipton. *Id.* at 134–39.

**4.** He concluded his closing argument by repeating that "there's a mistake. Rodney Tipton wasn't there," and by pointing out that the judge "is going to tell you about reasonable doubt." *Id.* at 140.

**5.** R. 148 at 155–56, 163, 165.

**6.** *See supra* note 3.

**7.** *See supra* note 1.

Therefore, we find the trial court's error to be harmless. If any one of these four factors had not applied, then the failure to give the *Telfaire* instruction would have been prejudicial error, requiring a remand for a new trial.

### B. Sufficiency of the Evidence

Both Defendants claim that the evidence against them was insufficient to support their convictions. "We have held that on appeal from a criminal conviction we must only determine 'whether the relevant evidence viewed in the light most favorable to the government could be accepted by a reasonably-minded jury as adequate and sufficient to support the conclusion of defendant's guilt beyond a reasonable doubt.'" *United States v. Seltzer,* 794 F.2d 1114, 1119 (6th Cir.1986) (quoting *United States v. Meyers,* 646 F.2d 1142, 1143 (6th Cir.1981)), *cert. denied,* 479 U.S. 1054, 107 S.Ct. 927, 93 L.Ed.2d 979 (1987). In reviewing claims for sufficiency of evidence to support a conviction, we grant relief only if we find that, on the record evidence adduced at the trial, no rational trier of fact could find proof of guilt beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 2791, 61 L.Ed.2d 560 (1979).

Tipton points out that the only evidence that he was involved in the crime is the testimony of Blair, based on her seeing her assailant for a few seconds, at night, while struggling for the gun in the parking lot of the Crossroads of Time Motel. He argues that Blair's testimony contained significant discrepancies that call into question her powers of recall and observation as well as her credibility. These discrepancies include whether Blair's assailants had one gun or two, and whether the car that pulled up behind Blair in the grocery parking lot was similar to a Toyota or Datsun. However, the jury already considered these so-called "significant discrepancies" and still believed Blair's testimony. There is no doubt that it was rational for the jury to do so. In effect, Tipton is asking this court to re-weigh the evidence. This we cannot do. "[T]he appellate court must vigilantly refrain from conducting a *de novo* review of the evidence." *Mahoney v. United States,* 831 F.2d 641, 645 (6th Cir.1987) (citing *Anderson v. City of Bessemer,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)), *cert. denied,* 486 U.S. 1054, 108 S.Ct. 2820, 100 L.Ed.2d 922 (1988).

Davis's argument has even less merit than Tipton's. He points to the lack of physical injuries to Blair's genitals and anus, to her failure to try to escape prior to Davis's falling asleep, to the lack of a grocery store receipt, and to the same "significant discrepancies" upon which Tipton relies, and concludes that Blair fabricated her entire story. Davis admits, however, that the entire matter depends on Blair's credibility. From this admission alone, it follows that the evidence against Davis was sufficient for the jury to find Davis guilty.

### C. Increased Sentence for "Serious Bodily Injury"

Defendants admit that the evidence at trial was "in line with 'bodily injury'", but argue that Blair's injuries were not severe enough to qualify as "serious bodily injury" under the Sentencing Guidelines. The trial court found that the "repeated oral, anal, and vaginal rape of this victim by both defendants was clearly an 'injury' that was 'significant', 'painful' and 'obvious' within the meaning of Application Note 1(b) of the [United States Sentencing Guidelines] § 1B1.1." J.A. at 39. The court further found the injury required medical intervention "because the emergency room physician had to probe inside the victim's body," and "that the extreme trauma that the victim was subjected to during the course of the incident was sufficient to constitute an impairment of a mental faculty." *Id.* Consequently, the court imposed a two point increase for serious bodily injury.

Defendants are challenging the court's factual finding that serious bodily injury occurred, and not the court's legal conclusions. A court's factual findings in relation to the application of the Sentencing Guidelines are subject to a deferential "clearly erroneous" standard of review. *See* 18 U.S.C. § 3742; *United States v. Garner,* 940 F.2d 172, 174 (6th Cir.1991). A finding of fact will only be clearly erroneous when,

although there may be some evidence to support the finding, "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Bueno v. Mattner*, 829 F.2d 1380, 1384 (6th Cir.1987) (quoting *Anderson*, 470 U.S. at 574, 105 S.Ct. at 1511), *cert. denied*, 486 U.S. 1022, 108 S.Ct. 1994, 100 L.Ed.2d 226 (1988).

Under the Sentencing Guidelines, "bodily injury" is defined as "any significant injury; *e.g.*, an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." United States Sentencing Commission, *Guidelines Manual*, § 1B1.1, Application Note 1(b). "Serious bodily injury" is defined as "injury involving extreme physical pain or the impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." *Id.*, Application Note 1(j).

In its sentencing order, the district court justified its finding of serious bodily injury by quoting from the transcript passages in which: Blair testified that she was in terror, or in intense pain; Police Chief Davis testified that Blair was "very frightened, shaking and crying," and was lying on the motel office floor in a fetal position; and Dr. Lane testified that, when he used a vaginal speculum in examining Blair, she "flinched and sort of moaned or yelled out." J.A. at 31–38.

The government cites the case of *United States v. Newman*, 1991 WL 63625, 1991 U.S.App. LEXIS 8478 (6th Cir. April 23, 1991) (unpublished per curiam), *cert. denied*, — U.S. ——, 112 S.Ct. 163, 116 L.Ed.2d 127 (1991). In *Newman*, the defendant was convicted of raping a 74–year–old woman. The issue was the same as the issue presently before the court, namely the application of the term "serious bodily injury" under the Guidelines. The victim had no sign of physical injury or trauma, but had undergone psychological counseling at a sexual assault crisis center. We held that:

> Whether or not the injury involved "extreme" physical pain, we believe that the injury could also fairly be said to have required medical "intervention" within the meaning of Application Note 1(j). The doctors had to probe inside the victim's body, and this is more than mere "attention;" it constitutes "intervention" of the most literal sort, and qualifies the injury as "serious" under the guideline definition. The injury would likewise have to be classified as serious, moreover, if it involved the impairment of a mental faculty, and we think such impairment could well have occurred here.

> \*     \*     \*     \*     \*     \*

> [W]e are not prepared to say that the district court committed clear error in finding that this elderly widow suffered a "serious" bodily injury.

> \*     \*     \*     \*     \*     \*

> [W]e think it unlikely that the Sentencing Commission intended this particular enhancement to be withheld in all but the most extreme cases of serious bodily injury.

*Id.*, 1991 WL 63625 at \*\*3–4, 1991 U.S.App. LEXIS at \*\*7–9.

While it is true that Blair is a young woman, not an elderly widow, and that we do not know whether Blair has sought psychological counseling, nevertheless the reasoning of *Newman* is applicable in the present case. In light of Blair's and Police Chief Davis's testimony—Davis found Blair curled into a fetal position—it is clear that the court below did not act impermissibly in finding that Blair's mental faculty was impaired. Moreover, Blair was subjected to the same medical "intervention of the most literal sort" as that to which the victim in *Newman* was subjected. Therefore, the district court's finding of "serious bodily injury," and its subsequent imposition of a two point increase under the Guidelines, was not clearly erroneous.

### D.  The Trial Judge's Comments

Defendants argue that various comments made by the trial judge prejudiced their defense. Because they did not object to

these comments, nor did they argue that to do so would have exacerbated the situation, this court will not reverse on this ground "unless the trial judge committed plain error." *United States v. Slone,* 833 F.2d 595, 598 (6th Cir.1987); *United States v. Smith,* 561 F.2d 8, 13 (6th Cir.), *cert. denied,* 434 U.S. 972, 98 S.Ct. 524, 54 L.Ed.2d 461 (1977). "The plain error doctrine mandates reversal 'only in exceptional circumstances' and only where the error is so plain that 'the trial judge and prosecutor were derelict in countenancing it.'" *Slone,* 833 F.2d at 598 (quoting *United States v. Mendez–Ortiz,* 810 F.2d 76, 78 (6th Cir.1986), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 697 (1987); *United States v. Hook,* 781 F.2d 1166, 1172 (6th Cir.), *cert. denied,* 479 U.S. 882, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986); *United States v. Frady,* 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)).

Defendants cite to ten allegedly objectionable comments: four during the cross-examination of Hartsell, one during the cross-examination of Graves, three during the cross-examination of Bivens, one during the cross-examination of Underwood, and the last during the cross-examination of Richesin.

### 1. Cross–Examination of Hartsell

Hartsell was testifying near to the end of the first day of the trial. Apparently, his wife was in the emergency room of a hospital and it would have been a hardship to have him return the following day. *See* J.A. at 220. The judge expressed on the record that he did not want to keep the jury after 5:00 p.m., but that he "hated" to ask the witness to come back tomorrow. The transcript suggests that the judge began to get impatient as the hour grew late, apparently when he began to worry that the cross-examination would not be finished by 5:00.

In the first two allegedly objectionable comments, the judge expressed impatience with defense counsel's asking redundant questions.[8] The record shows that the questions precipitating the judge's outburst were indeed redundant; a number of the questions were substantively identical to questions the government had already asked the witness.

The third allegedly objectionable comment took place after defense counsel asked how Hartsell was able to reenter the motel room that Davis, Tipton and Blair were in when Hartsell had given Davis a master key. Hartsell responded that he had multiple master keys. The judge *sua sponte* found the question and answer to be irrelevant. Although the question could conceivably have elicited an answer that could have been used to impeach Hartsell, it was not an abuse of discretion for the judge to have found it irrelevant that Hartsell had extra keys.

A few minutes later, Hartsell responded to a question by explaining that he had been asked the same question in state court 5 or 6 times. The judge asked, "Who asked you the question five or six times? . . . I knew who the suspect was, I just wanted you to prove it."

In view of the late hour, the witness's pressing need to not come back tomorrow, and defense counsel's promise to keep the cross-examination short, the first three allegedly objectionable comments were not inappropriate at all. However, we agree with Defendants that the fourth comment—"I knew who the suspect was"—was an unfortunate and inappropriate put-down of defense counsel.

Nevertheless, defense counsel had been asking redundant questions, and the jury knew that the judge was concerned about

---

8. First, the judge asked, "Why do you keep asking questions and getting the same answers that he's already given? Is there any reason for doing that?" J.A. at 217.

Minutes later, counsel for both parties asked the court to keep the jury late in order to save the witness from having to come back the next day. Defense counsel promised to keep it brief. J.A. at 220. Nevertheless, he continued to ask redundant questions. At about 5:05, the second allegedly objectionable comment occurred:

Prosecutor: Your Honor, we've been over this two or three times.
Court: I don't know. It takes me longer to try to stop it than it does to listen to it.
Defense Counsel: I just have a few more.
Court: I'm trying to move. What else do you have? What other areas have you got to get into? I'm going to go on home if its going to take another 30 minutes or so. Well, how long?
J.A. at 225–26.

keeping them late, that although he was doing so for good reason, the circumstances were trying his patience after a long day of heavy emotional testimony. Significantly, defense counsel had expressly joined the government in asking the judge to keep on going after 5:00. More importantly, the judge expressly instructed the jurors that they were not to consider the judge's comments and questions in their deliberations. Tr., Vol. II, at 156, 161. For these reasons, even though we strongly disapprove of the judge's inappropriate comment, it cannot be considered plain error.

## 2. Recross–Examination of Graves

The fifth comment that Defendants argue was objectionable occurred when Defense Counsel was trying to determine whether police had tried to find witnesses to corroborate Blair's presence in the grocery store on January 7, 1991. Apparently, the judge intervened because he thought that the questioning was beyond the scope permitted on re-cross.[9] This was an appropriate reason to intervene. Defense counsel was apparently about to try to defend his line of questioning as within the proper scope for re-cross. The court interrupted, "go ahead, but get to the point," presumably because it would be quicker to wait for a concise question than to argue about the scope on re-cross. Even though the judge's tone may have been inappropriate, this exchange was not plain error.

## 3. Cross–Examination of Bivens and of Underwood

The sixth allegedly objectionable comment was the judge's *sua sponte* finding a question to be irrelevant. Defense counsel had asked Bivens about the publicity that this case had engendered. J.A. at 272. Similarly, the seventh allegedly objectionable comment involves the court's finding another question to be irrelevant—this time Bivens was asked,

"How big a man is Mr. Underwood?" (Defense counsel knew that Underwood was there and would be called to testify soon after Bivens). Here the court's findings were correct and appropriate; the questions were indeed irrelevant.

■ The eighth and ninth allegedly objectionable comments involved the judge's interrupting defense counsel to ask a few questions himself. J.A. at 282–83, 287. While we do not see any good reason for the judge's intervening, and we sympathize with defense counsel that the interruptions may have been distracting or even embarrassing, as well as unnecessary, the transcript does not indicate that any real prejudice resulted. Defense counsel resumed asking his own questions right after the interventions. We note, too, that the court clearly warned the jury to disregard its own questions and comments. Tr., Vol. II, at 156, 161. There is no plain error here.

## 4. Cross–Examination of Richesin

The court expected that Dr. Lane was going to testify after Richesin. It turned out that Dr. Lane could not make it and his deposition was read to the jury instead, but the court did not know this during Richesin's cross-examination. So, when defense counsel asked Richesin about whether Dr. Lane was on duty on January 8, the judge interrupted, "He'll come to testify. He'll surely tell that. Do you want to prove it by her? Is it in dispute? ... We try disputed matters." J.A. at 292. Clearly, the judge's display of impatience was inappropriate, but the point of law was correct. Even if defense counsel did not deserve an admonishment as severe as this one, the judge was within his discretion to admonish counsel's improper question. This, too, is not plain error.

In short, some of the judge's comments or admonishments were inappropriate, and tak-

---

9. Court: What's that got to do, on the redirect—
Defense Counsel: Your Honor, just if there's any misperception that this agency wasn't until August—
Court: They put these on, you can ask about these; but you're going back into how much investigation the department had and everything else, and we already have gone over that.

Defense: I'm not sure. If I could ask—
Court: All right, ask him. Get right to the point though. You can lead him. You don't have to wallow around with it. You've got liberties. Put it on him what you—
J.A. at 247.

en as a whole, it may be true that they undermined defense counsel's credibility to some small degree. However, defense counsel was not innocent in this matter—he undermined his own credibility as well. In light of the circumstances described above, and especially in light of the judge's instructing the jury to disregard his own questions or comments, the judge's improper comments do not amount to plain error.

### E. Previous Trial in State Court

While acknowledging that, under the dual sovereign doctrine, double jeopardy is not applicable, Defendants argue that this federal prosecution constitutes a violation of the Department of Justice's *Petite* policy, according to which the department will not prosecute a federal offense following a state prosecution for the same act unless it is necessary to advance compelling interests of state law enforcement. Defendants' Brief at 47 (citing *Petite v. United States,* 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960)).

However, Defendants admit that "violation of the *Petite* policy confers no rights upon the accused." *Id.* (citing *United States v. Renfro,* 620 F.2d 569 (6th Cir.1980), *cert. denied,* 449 U.S. 902, 101 S.Ct. 274, 66 L.Ed.2d 133 (1980)). Yet, mysteriously, Defendants "submit that the conviction and punishment meted out in the District Court violated their double jeopardy and due process rights under the Fifth Amendment to the Constitution." *Id.* In light of Defendants' own admissions, their claim is facially without merit.

Similarly, Defendants ask this court to consider whether their sentences were unlawful because they were not sentenced "simply for kidnapping." *Id.* at 48–49. They offer no argument except to point out that, had they only been sentenced for kidnapping, their sentences would have been lighter. However, by Defendants' own admission, where a victim is kidnapped to facilitate the commission of another offense, and the level for the other offense is greater than the level for kidnapping *simpliciter,* the Guidelines require a court to apply the heavier sentence. U.S.S.G. § 2A4.1(5). In the present case, the kidnapping facilitated criminal sexual

abuse, which has a higher guideline level than kidnapping alone. Thus, it was absolutely correct under the Guidelines for the court to impose the sentence for sexual abuse. Once again, Defendants' "claim" is without merit on its face.

### F. The Judgment Should Be Corrected

Both parties agree that the judgment incorrectly states that Blair was kidnapped and held for ransom. The government asks that the judgment be corrected to reflect that she was kidnapped and "held for ransom, reward or otherwise." We hereby grant this request.

### III. Conclusion

For the foregoing reasons, we instruct the district court to correct the judgment to reflect that the defendant was "held for ransom, reward or otherwise," and otherwise affirm Defendants' convictions and sentences.