**UNITED STATES of America**

**v.**

**Samuel Alexander AMERSON, Jr.**

No. 4:CR–94–038.

United States District Court,
M.D. Pennsylvania.

Aug. 25, 1994.

George Rocktashel, Asst. U.S. Atty., Lewisburg, PA, for U.S.

Hugh A. Benson, Jr., Selinsgrove, PA, for Samuel Alexander Amerson, Jr.

OPINION

MUIR, District Judge.

### I. Introduction.

On March 16, 1994, the Grand Jury for the Middle District of Pennsylvania, sitting in Williamsport, returned a one-count indictment charging Samuel Alexander Amerson, Jr. with possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g) and 924(e). On April 1, 1994, Amerson appeared before the Court and entered a plea of guilty. The Court accepted the plea, ordered a presentence investigation, and scheduled a presentence conference for June 30, 1994.

The presentence report with an addendum was prepared by Probation Officer Drew Thompson and submitted to the Court, the Defendant, defense counsel, and the Government.

We will summarize the offense conduct as set forth in the presentence report so as to illuminate the significance of certain of our findings of fact. Amerson was paroled from the Maryland Department of Public Safety and Correctional Services on March 11, 1993. Thereafter he lived a transient lifestyle, eventually travelling to Pennsylvania. On June 6, 1993, Amerson encountered three young children (two boys, aged 12, and a girl, aged 10) who were walking along a trail in a wooded area in Snyder County. Amerson lured the children from the trail by offering to show them a dead deer. Once off the main trail, Amerson brandished a .22 caliber revolver and led them to a secluded area. He ordered them to remove their pants and shoelaces, tied up each child with the shoelaces and made the children lie on their pants. With the two boys lying less than 6 feet away, Amerson vaginally and anally raped the young girl and put his penis in her mouth. During the assault he threatened to shoot her if she did not stop crying. After raping the girl, Amerson put the revolver to the little girl's head intending to murder her but could not pull the trigger because of the look in her eyes. Amerson then told the children to lie quietly for 10 minutes while he fled. The children untied themselves and ran to their homes where police were summoned.

Medical examination of the little girl showed that she suffered from vaginal bleeding, rope burns upon her wrist, and abrasions on her back and elbows. On June 7, 1993, Amerson was stopped by the Pennsylvania State Police on Route 11 near Ted's Landing, Selinsgrove. Amerson was walking along the highway and matched the description provided by the children. The Pennsylvania State Police determined that there was a warrant for Amerson issued by Maryland parole authorities. During the arrest, a loaded .22 caliber handgun was found on Amerson's person together with 32 rounds of ammunition. After Amerson was arrested, he waived his right to counsel and his right to remain silent and provided a detailed statement to the Pennsylvania State Police. Amerson admitted his involvement, stated that he pointed the firearm at each of the children several times during the incident and that he intended to use the handgun to kill the children. Amerson told authorities that if he has another chance to kill, he will do so. Amerson reported that he had stolen the firearm from a church in Melvern, Indiana. The weapon was test-fired and found to be fully operable. The Bureau of Alcohol, Tobacco, and Firearms determined that the weapon had travelled in interstate commerce. Amerson is prohibited from possessing such a firearm because of prior felony convictions. The foregoing facts set forth in the presentence report were not objected to by Amerson.

In the presentence report Probation Officer Thompson concluded that because the firearm was possessed in connection with a criminal sexual abuse, the base offense level should be calculated by using the guideline for the substantive offense. The guideline for a violation of possession of a firearm by a

felon, 18 U.S.C. § 922(g), is U.S.S.G. § 2K2.1. Pursuant to § 2K2.1(c)(1)(A), because Amerson possessed the firearm in connection with another offense, § 2X1.1 of the sentencing guidelines is applied. Section 2X1.1 provides that the base offense level is calculated by using the guideline for the substantive offense. Amerson possessed the firearm in connection with criminal sexual abuse. Section 2A3.1(a) indicates that the base offense level for that category of offenses is 27.

In calculating the total offense level, Mr. Thompson added 4 levels to the base offense level of 27 pursuant to U.S.S.G. § 2A3.1(b)(1) for displaying a firearm during the offense, 4 levels pursuant to U.S.S.G. § 2A3.1(b)(2)(A) because the victim had not attained the age of 12, 2 levels pursuant to § 2A3.1(b)(4)(B) because the victim sustained serious bodily injury and 4 levels pursuant to § 2A3.1(b)(5) because the victim was abducted. Mr. Thompson also accorded Amerson a 3–level reduction for acceptance of responsibility. Mr. Thompson originally found that Amerson had a criminal history category of VI, a total offense level of 38, and a guideline imprisonment range of 360 months to life.

At the presentence conference it was determined that there were no disputed issues of fact other than whether the 10 year old child suffered serious bodily injury and that it was necessary to hold a presentence hearing on that issue. At the presentence conference we also notified defense counsel that we were considering an upward departure in this case. By order of July 7, 1994, we also notified Amerson and defense counsel specifically that we were considering an upward departure pursuant to § 4A1.3 of the sentencing guidelines which allows an upward departure where criminal history category VI does not adequately reflect the seriousness of the defendant's criminal history. Furthermore, we advised Amerson that we are of the view that a 2–level increase in the offense level may be warranted under U.S.S.G. § 3A1.3, Restraint of Victim. Finally, we notified Amerson that we were of the view that an upward departure may be warranted based on facts that were not adequately taken into consideration by the sentencing commission in formulating the guidelines. In formulating § 2A3.1 of the guidelines, the Sentencing Commission did not take into consideration instances where a victim was penetrated repeatedly and where there was more than minimal planning. In the present case, arguably there was more than minimal planning because Amerson lured the children to a secluded spot with an initial intent to kill the children.

On July 8, 1994, Mr. Thompson filed a second addendum to the presentence report based upon his position that Amerson has not accepted responsibility for the instant federal offense because Amerson has continued to engage in criminal conduct pending sentencing by way of an attempted escape from the Snyder County Prison. By order of July 13, 1994, we notified Amerson that the issue of acceptance of responsibility would be addressed at the presentence hearing.

A presentence hearing was held on August 22, 1994. The following are the Court's findings of fact, discussion, and conclusions of law with regard to (1) whether one of the victims suffered serious bodily injury under § 2A3.1(b)(4)(B) of the sentencing guidelines, (2) whether a 2–level increase for physical restraint of the little girl applies under § 3A1.3, (3) whether the Defendant's recent escape attempt precludes a reduction in offense level for acceptance of responsibility, and (4) whether an upward departure is appropriate based upon the restraint of the victim, Amerson's criminal record, and factors not addressed by § 2A3.1 of the guidelines such as the repetitious nature of the sex acts and more than minimal planning.

II. Findings of Fact.

1. Amerson has been convicted for child molesting committed in Wisconsin in 1977 at the age of 22, and first degree sexual assault committed in Indiana in 1979 at the age of 24. (Undisputed, hereafter referred to as "U")

2. While serving a sentence of six years imprisonment in Wisconsin for assaulting the ten year old victim in 1977, Amerson escaped from custody in 1979, and while a fugitive, sexually assaulted another six year old girl in a wooded area in Fort Wayne, Indiana. (U)

3. In 1980, Amerson received a consecutive sentence of five years imprisonment in Allen County, Indiana, and one year imprisonment on the escape charge. (U)

4. Following his release from custody in 1983, Amerson continued his criminal activities, resulting in convictions for the burglaries of three residences and the theft of a car in Garrett County, Maryland. (U)

5. Amerson was sentenced in 1983 to an aggregate term of 27 years imprisonment in Garrett County, Maryland Circuit Court, and released on parole supervision in August 1992. (U)

6. While on parole, in September 1992, Amerson was arrested and convicted for the burglaries of a residence and business in Springfield, Tennessee, and sentenced to an aggregate five year sentence of imprisonment in 1993. (U)

7. Samuel Alexander Amerson, Jr. was reparoled via mandatory release from the Maryland Department of Public Safety and Correctional Services on March 11, 1993. (U)

8. Thereafter, he lived a transient lifestyle, eventually traveling to Pennsylvania. (U)

9. On June 6, 1993, Mr. Amerson encountered three young children (two boys, age twelve, and a girl, age ten) who were walking along railroad tracks in a wooded area in Snyder County. (U)

10. While on parole, Amerson sexually assaulted the ten year old female victim and kidnapped her twelve year old brother and another twelve year old boy in this case on June 6, 1993. (U)

11. The Defendant lured the children from the trail by offering to show them a dead deer. (U)

12. Once off the main trail, Amerson brandished a .22 caliber revolver and led them to a secluded area. (U)

13. He then ordered them to remove their pants and shoelaces. (U)

14. Amerson then tied each child up using the shoelaces and made the children lay on their pants. (U)

15. With the two boys lying less than six feet away, Amerson vaginally and anally raped the young girl and put his penis in her mouth. (U)

16. The Defendant engaged in anal and oral sex with the victim, and vaginal sex without full penetration, all involving one act. (U)

17. During the assault, he threatened to shoot her if she did not stop crying. (U)

18. During the course of the sexual assault the victim was not beaten. (U)

19. After raping the girl, Amerson told the children to lay quietly for ten minutes while he fled. (U)

20. The children untied themselves and ran to their homes where police were summoned. (U)

21. The 10–year–old girl was in shock shortly after the sexual assault.

22. On June 7, 1993, Mr. Amerson was stopped by the Pennsylvania State Police (PSP) on Route 11, near Ted's Landing, Selinsgrove. (U)

23. The Defendant was walking along the highway and matched the description provided by the children. (U)

24. The PSP troopers determined that there was an active warrant for Mr. Amerson issued by Maryland parole authorities. (U)

25. During the arrest, the loaded .22 caliber handgun was found in Mr. Amerson's waist area, in addition to thirty-two rounds of ammunition. (U)

26. After the defendant was arrested, he waived his right to counsel and his right to remain silent, and provided a detailed statement to the PSP. (U)

27. Amerson admitted his involvement and acknowledged that he intended to use the handgun to kill the children. (U)

28. He pointed the firearm at each of the children several times during the incident. (U)

29. After assaulting the girl, he was prepared to shoot her and held the weapon to her head. (U)

30. He told police that the look in her eyes made it impossible for him to pull the trigger.

31. Amerson told authorities that he wanted to kill the children, and that if he has another chance to kill, he will. (U)

32. The Defendant advised that he stole the firearm from a church in Melvern, Indiana. (U)

33. The weapon was test fired and found to be fully operable. (U)

34. In addition, the Bureau of Alcohol, Tobacco and Firearms determined that the weapon had traveled in interstate commerce. (U)

35. The defendant is prohibited from possessing such a firearm due to his prior felony convictions. (U)

36. When interviewed by the Probation Officer, the defendant reiterated his statements to the investigating officers. (U)

37. He stated that he wanted to die but did not have the resolve to kill himself. (U)

38. He felt that if he killed the children as he originally planned to, he would receive a death sentence. (U)

39. The female victim suffered lacerations of the outer areas of the vagina and of the rectum.

40. A medical examination revealed a linear laceration "in the area between the labia minora and majora" and "a laceration on the hymenal tissue."

41. Medical evidence indicated that the victim's physical injuries involved the swelling of the vaginal area, and a laceration in the anal area, and a superficial laceration in the vaginal area. (U)

42. Neither of the lacerations required suturing and no medications were prescribed by the physician for any pain or swelling. (U)

43. Examination of the hymen revealed edema, or swelling, which precluded a pelvic exam of the victim. (U)

44. An internal pelvic exam was not conducted because it would have caused extreme pain to the victim. (U)

45. Throughout the physical examination at the hospital the victim was reported as being calm and cooperative. (U)

46. The victim reported bleeding from the vagina and rectum as a result of the assault. (U)

47. Other signs of trauma included red marks around the wrists where the defendant bound the victim, and multiple abrasions and bruises on her back. (U)

48. The medical evidence indicated that there was no full penetration by the defendant of the victim. (U)

49. Specimens were obtained from the vagina and rectum for analysis by introducing a curette into or around those bodily orifices. (U)

50. In addition, cultures were performed for sexually transmitted diseases, including gonorrhea, syphilis, and chlamydia. (U)

51. Follow up medical care included a return visit within one to two weeks for physical examination, cultures and screening for Trichomonas and nonspecific vaginitis, and within six weeks for pregnancy testing, testing for syphilis, and hepatitis B surface antigen testing.

52. The victim complained to her mother of soreness, pain and difficulty in urination and defecation.

53. To alleviate the pain on defecation, the victim's mother administered sitz baths and the victim's physician recommended the use of stool softeners.

54. The victim has received counseling in connection with the assault.

55. The victim suffered extreme physical pain as a result of both the sexual assault and by being bound with her hands behind her back during the sexual assault.

56. The victim experienced pain and difficulty which impaired normal urinary and bowel function.

57. The victim required medical intervention, including internal examination of the vagina, mouth and anus using a curette to obtain specimens used in testing for venereal disease. (U)

58. The medical evidence indicated that there was no permanent trauma to the vaginal area of the victim such as scarring. (U)

59. The female victim, her brother who was kidnapped by the defendant, and the victim's mother received counseling for the psychological stress suffered as a result of the attack.

60. On or about May 30, 1994, the Defendant removed the caulking from around the window in his jail cell at the Snyder County Jail. (U)

61. The Defendant has been charged with attempted escape from the Snyder County Prison; however, there has been no conviction for that offense. (U)

62. The alleged escape attempt involved only the removal of caulking material from the window in the cell of the Defendant. (U)

63. The Defendant had pled guilty to the Federal firearms offense at the time of his arraignment, and had pled guilty for the sexual assault in the state prosecution. (U)

64. The Defendant has an extensive criminal record which has been adequately reported by the Probation Department in their (sic) presentence investigation report. (U)

65. The Defendant was determined to have mental apparitions as to sexual matters in 1977, and the Defendant was incarcerated in the Winnabago Mental Health Institute in Oshkosh, Wisconsin for approximately three years. (U)

66. There are no other offenses either criminal or civil which are not reported in the Defendant's presentence investigation report. (U)

67. The existing presentence investigation report has increased the sentencing offense level by four levels because of the presence of an abduction. (U)

68. Any additional factual statements set forth in the discussion portion of this opinion constitute findings of fact by this Court and are hereby incorporated by reference as though fully set forth herein.

### III. Discussion.

█ The first matter for consideration is whether the female victim suffered serious bodily injury. Under § 2A3.1 of the sentencing guidelines, a 2-level increase in the offense level is required if such injury occurred. The commentary accompanying § 1B1.1, specifically application Note 1(j), defines "serious bodily injury" as "... injury involving extreme physical pain or the impairment of a function of a bodily member, organ or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation."

In *United States v. Tipton*, 11 F.3d 602 (6th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2692, 129 L.Ed.2d 823 (1994), the Court of Appeals for the Sixth Circuit affirmed a district court decision imposing a 2-level increase for serious bodily injury suffered by the victim of a sexual assault. Although the adult victim in that case had no signs of physical injury or trauma, the Court concluded that because the victim required medical intervention in the form of a post-rape examination and was found by witnesses after the assault curled in the fetal position, the district court's finding of "serious bodily injury" and a 2-level increase under the guidelines were appropriate.

Here the evidence of serious bodily injury is more compelling. The victim sustained bleeding after the assault. She suffered lacerations of the vagina and rectum. Her hymen was so swollen from the rape that the doctors decided not to perform a pelvic examination immediately. She experienced pain and difficulty in the most basic bodily functions and underwent counselling and follow-up medical care.

It is important to note that after the rape of the ten year old the pediatrician would not perform an examination of the internal genital area because of the extreme pain which he anticipated she would suffer. Thomas F. Hahn, M.D., testified as follows:

Q   Now, in connection with the physical exam that you conducted, was there any kind of internal examination conducted of the—the internal genital area?

A   Not by me, because there was too much swelling that day and it would have been too painful. And anytime you do see lacerations in the external genitalia, you

always have to be concerned that there could be internal lacerations. But with the degree of swelling that she had that day, it wouldn't have been—wouldn't have been reasonable to do that. And that's one of the reasons we made the follow-up with Dr. Waldrop.

\*　　\*　　\*　　\*　　\*　　\*

Q Would it be fair to describe the pain involved in there as extreme physical pain which would have precluded an internal examination which might otherwise have resulted in extreme stress, either physical or psychological, to the patient?

A Well, the whole—I mean—even—even the exam that we did I would take as highly stressful. But yeah, to try and examine that area, I mean, internally with the swelling and those lesions would have been—would have been terribly painful unless, you, you know, put her under sleep with general anesthesia. . . .

\*　　\*　　\*　　\*　　\*　　\*

Q So the patient's demeanor wouldn't necessarily have precluded the pelvic exam in this case; it was your concern about the extreme pain she would suffer if you actually conducted the pelvic exam, is that correct?

A Right. That's right.

(See Deposition Transcript of Thomas F. Hahn, M.D., Government Exhibit 2, at pages 10, 11 and 14.)

Charles Danny Waldrop, M.D., testified as follows:

Q Well, was there any effort to—well, let's put it this way. Are you familiar with the pediatric sexual assault protocol?

A Yes. Yes.

Q I'll ask you about that. Let's kind of define it. . . .

A I look at the external genital anatomy. I look at the hymenal tissues. I did not make any attempt to go beyond the hymen. Standard techniques of examination in a child, especially prepubertal child, as she was, is that we never go in beyond the hymen, except in very extraordinary circumstances.

If there's an instance where there's been a penetrating injury, let's say, an accidental penetrating injury up into the vagina proper, that is the tissues past the hymen, then we may attempt to—to look in that area. But in almost all those cases, we would have to use general anesthesia and put the child to sleep.

The reason for that is because prior to puberty, the hymen, after the immediate newborn period and prior—from that time until the onset of puberty, the hymen is a very thin, somewhat fragile tissue. And it can be very traumatic to the infant to put anything in past the hymen with any diameter whatsoever.

\*　　\*　　\*　　\*　　\*　　\*

Q You didn't introduce your finger or palpate or anything like that?

A No. If I had attempted to introduce my finger, that in itself would have been traumatic and probably would have caused some significant injury to the hymen.

Q Do you know whether or not that would have resulted in additional pain to the patient?

A Absolutely.

Q And why is that?

A Because the diameter of the finger is much larger than the diameter of the opening of the hymen.

(See Deposition Transcript of Charles Danny Waldrop, M.D., Government Exhibit 3, at pages 7, 8 and 10.)

The victim here suffered extreme physical and psychological pain as a result of both the sexual assault and by being bound with her own shoelaces. In addition, she experienced pain and difficulty which impaired normal urinary and bowel functions. Finally, at the tender age of 10, she required medical intervention, including examination of the most private areas of the body, testing for venereal disease and pregnancy, and counselling for the psychological stress suffered as a result of the attack. These facts require a 2–level increase in the offense level under § 2A3.1(b)(4)(B) because the victim suffered "serious bodily injury."

■ Section 3A1.3 of the guidelines requires a 2–level increase in the offense level if the victim was physically restrained in the course of an offense. In determining the total offense level, the Probation Officer did not apply this section of the sentencing guidelines. We notified counsel that we were considering such an increase and the issue was briefed. Section 1B1.1 of the sentencing guidelines defines physically restrained as "the forcible restraint of the victim such as being tied, bound, or locked up." U.S.S.G. § 1B1.1, Commentary, Application Note 1(i). Amerson did receive a 4–level increase for abducting the 10 year old victim of the sexual assault. However, the definition of physically restrained contains an element other than contained in the definition of abduction. Application Note 1(a) of Section 1B1.1 states:

> "Abducted" means that a victim was forced to accompany an offender to a different location. For example, a bank robber's forcing a bank teller from the bank into a getaway car would constitute an abduction.

In this case, the 10 year old girl was not only forced to accompany the offender to a different location, she was tied up with her shoelaces. Amerson physically restrained not only the female victim, but also the two male victims. He led them at gunpoint to a secure location, where he ordered them, again at gunpoint, to remove their shoelaces, which he then used to bind the limbs of the victims. With the gun at the ready, he proceeded sexually to assault the little girl in the presence of the two young boys. We will add 2 levels to the offense level for restraint of the 10 year old victim.

■ We now turn to the question of acceptance of responsibility. U.S.S.G. § 3E1.1(a) reads as follows:

> If the Defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels.

In this case, the probation officer initially recommended a reduction of 2–levels for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and an additional 1–level reduction under U.S.S.G. § 3E1.1(b)(2) because the base offense level was greater than 16 and Amerson timely notified authorities of his intention to enter a plea of guilty. However, because Amerson attempted to escape from the Snyder County Jail on May 30, 1994, while awaiting sentencing in this case the probation officer in the second addendum to the presentence report recalculated the offense level by eliminating the 3–level decrease for acceptance of responsibility.

Application Note 1(b) of § 3E1.1 permits us to consider whether Amerson has voluntarily terminated or withdrawn from criminal conduct or associations. The Probation Officer concluded that Amerson's recent escape attempt demonstrates that he has not terminated criminal conduct. In light of Amerson's removal of the caulking from around the window in his jail cell while awaiting sentencing in this case Amerson has clearly not demonstrated acceptance of responsibility.

Amerson's criminal history establishes not only a prior escape from custody but also a clear pattern of recidivism while not in custody. While incarcerated at the Snyder County Prison, Selinsgrove, prior to his entry of the guilty plea in this case, correctional officers apprehended Amerson in possession of a homemade knife. Information provided by informants indicated that Amerson planned to use the weapon to take a female staff member or attorney hostage and thereby escape from custody. (*See* ¶ 40 of the Presentence Report) (No objections were filed to the facts set forth in ¶ 40.) His recent escape attempt is fully consistent with his prior history and proves his continuing involvement in criminal activities. Accordingly, Amerson is not entitled to a 3–level decrease for acceptance of responsibility.

In light of our determination regarding a 2–level increase for serious bodily injury, a 2–level increase for restraint of victim, and the cancellation of the 3–level decrease for acceptance of responsibility, we need not address the question of departure at this time because we have reached a total offense level 43 which is the highest offense level possible and the guideline term is life imprisonment.

IV. Conclusions of Law.

1. The female victim sustained serious bodily injury from Amerson's sexual assault upon her.

2. The victim was physically restrained by Amerson during his attack on her.

3. Amerson has not voluntarily terminated criminal conduct as evidenced by his removal of the caulking from around his cell window at the Snyder County Prison.

4. Because Amerson has not terminated criminal conduct he is not entitled to a decrease in the offense level for acceptance of responsibility.

5. The base offense level is 27.

6. A 4-level increase is warranted pursuant to U.S.S.G. § 2A3.1(b)(1) because Amerson displayed a firearm during the offense.

7. A 4-level increase is warranted pursuant to U.S.S.G. § 2A3.1(b)(2)(A) because the victim had not attained the age of 12 at the time of the crime.

8. A 2-level increase is warranted pursuant to U.S.S.G. § 2A3.1(b)(4)(B) because the victim sustained serious bodily injury.

9. A 4-level increase is warranted pursuant to U.S.S.G. § 2A3.1(b)(5) because the victim was abducted.

10. A 2-level increase is warranted pursuant to U.S.S.G. § 3A1.3 because the victim was physically restrained.

11. The total offense level is 43.

12. The criminal history category is VI.

13. The guideline imprisonment term is life.

### Recapitulation

| | |
|---|---|
| Total offense level as calculated by the Probation Officer | 41 |
| Add 2 levels for restraint of the 10-year-old girl during the offense | 2 |
| Total offense level as calculated by the Court | 43 |
| Criminal history category as calculated by the Probation Officer, unchanged by the Court | VI |
| Guideline Imprisonment Range | Life |

An appropriate order will be entered.